## BLACKBURN V. OKLAHOMA CITY.

[*Opinion Filed Jan. 6, 1893.*]

1. PROVISIONAL CITY—*Contracts of.*—The original provisional municipal government of Oklahoma City was not a *de facto* municipal corporation, and had no power to contract or bind itself or successors by any agreements.

2. MUNICIPAL CORPORATION—*Legislative Authority.*—Prior to the act of congress of May 2, 1890, there was no law in the Territory of

Oklahoma authorizing municipal corporations, and where there is no law authorizing *de jure* municipal corporations a *de facto* corporation cannot exist. Such *de jure* corporations can only exist under legislative enactments.

3. ACT OF MAY 2, 1890—*De Facto Corporation.*—The act of congress of May 2, 1890, made provision for the organization of *de jure* municipal corporations, and the provisional government of Oklahoma City became and was a *de facto* corporation from and after that date.

4. DE JURE CORPORATION—*Liability of.*—A *de jure* successor of a *de facto* municipal corporation, which acquires the property, rights and improvements, and embraces the same territory, and is composed of the same people as its *de facto* predecessor, is liable for the valid contracts and legal liabilities of the *de facto* corporation.

*Appeal from the Probate Court of Oklahoma County*

*Douglass & Galbreath*, for appellant.

*R. G. Hays*, for appellee.

The opinion of the court was delivered by

BURFORD, J.: The plaintiff filed his complaint in the probate court of Oklahoma county, in which he alleged that on the 1st day of May, 1889, the defendant was organized as a municipal corporation and the voters thereof elected a mayor, city recorder, city treasurer, police judge and common council, who qualified before a United States commissioner and entered upon the discharge of their duties as such officers; that they continued to act as a municipal corporation and perform all the powers and duties as such until the 22d day of July, 1890, when said acting corporation was organized as a village corporation under and by virtue of the laws of the state of Nebraska, which had been adopted and extended over the Territory of Oklahoma by the act of Congress approved May 2, 1890, and said *de jure* corporation succeeded to all the property, rights, franchises, improvements and assets of the former municipality; that said village corporation mantained its corporate existence and exercised its powers and authority

until the 9th day of August, 1890, at which time the defendant was reorganized as a city of the second class, under the laws so adopted as aforesaid, and succeeded to all the property, improvements, rights, franchises and archives of its predecessor, and the said city of Oklahoma City exercised all the powers and authority, and performed all the duties of a *de jure* municipal corporation until the 7th day April, 1891, when said city was again re-organized under the laws of Oklahoma as adopted by her first legislature, and that said municipal corporation as last organized still exists and has succeeded to all the rights, franchises, powers, property and improvements of the original several corporations.

The plaintiff further alleges that he was elected recorder of said corporation and clerk of the common council at its first election in May, 1889, and continued to serve said corporation and its successors in said capacity, and performed all the duties required of him by the law and ordinances of said corporation until the 15th day of August, 1890, when he ceased to act in such capacity.

That the said provisional government agreed to pay him for said services as city recorder the sum of $50 per month, and an additional sum of $50 per month for his services as city clerk, and that he has advanced money for the said provisional municipal corporation, all of which was due and unpaid.

That he had presented his claims and demands to the mayor and council of the city of Oklahoma City, and the same had been rejected, disallowed and payment thereof refused.

To this complaint the city interposed a demurer, on the grounds that the complaint did not state facts sufficient to constitute a cause of action against the defendant. The demurrer was sustained. To which ruling an

exception was saved, and the cause comes here on appeal.

The only error assigned is the sustaining of the appellee's demurrer to the appellant's complaint.

The demurrer admits all the allegations of the complaint, which are well pleaded.

The original provisional municipal government of Oklahoma City was not a *de facto* corporation and had no powers or authority to contract or bind herself or her successors by any agreement. There was no law in Oklahoma authorizing municipal corporations prior to the act of Congress approved May 2, 1890, and where there is no law authorizing *de jure* corporations a *de facto* corporation cannot exist. Municipal corporations can only exist in this country by legislative authority. (*Losey v. City of Guthrie*, decided September, 1892, and authorities there cited.)

The act of Congress approved May 2, 1890, made provision for the organization and existence of *de jure* municipal corporations in Oklahoma, and the provisional government of Oklahoma City, as described in the complaint, became and was a *de facto* corporation from and after that date.

A *de jure* successor of a *de facto* corporation which acquires all the property, franchises, rights and improvements, and embraces the same territory and is composed of the same people as its *de facto* predecessor is liable for the valid contracts and legal liabilities of the *de jacto* corporation. (*Broughton v. Pensacola*, 93 U. S. 269; *Mobile v. Wattson*, 116 U. S. 289.)

The complaint alleges that the *de facto* corporation existed from May 2, 1890 to July 22, 1890, when it became a *de jure* corporation.

It is further alleged that both during the time said city was a *de facto* corporation, and after she became a *de jure* corporation, the plaintiff acted as recorder and

clerk of the common council until the 15th day of August, 1890. For this period of time, from May 2, 1890, to July 22, 1890, under the allegation of the complaint, the law would hold the present city liable for his services, provided the laws of Nebraska, under which they were acting, make provision for any such officer or office.

The laws in force in this Territory from May 2 1890 to the date of the taking effect of the laws adopted by the first legislature, made general provision for city and village corporations. And for villages and cities of the second class, provided for the office of city clerk; No such office as that of recorder was authorized or recognized by said laws, and as there cannot be a *de-facto* officer of the corporation for an office that does not exist and is not authorized, there could not have been either a *de-jure* or *de-facto* recorder for the defendent during the period mentioned in the complaint, after there was competent authority for a *de-jure* government, and no liability could attach to the defendant for services as such officer. But as the laws then in force did provide for a city clerk the defendant was a *de-facto* officer of the *de-facto* city government from May 2, 1890 to July 22, 1890 at which latter date the *de-jure* municipality succeeded the *de-facto* corporation. From and after this date the complaint alleges that plaintiff continued as such officer until August 15, 1890. If the plaintiff was the *de-facto* city clerk, or the *de-jure* clerk, during this period, the present city government would be liable for the services rendered, subject to the statutory limitation on the salaries of city officers in force at that date, provided there was not at that date a *de-jure* city clerk acting for said city. For it is well settled that there cannot be a *de-facto* officer for a *de-jure* office which is filled by a *de-jure*

officer.    It does not appear from  the  complaint that
there was a *de-jure* clerk  during  the  latter  period and
this question can only  be  presented  by answer.    Our
conclusion is that for  the  period  from  May 2,  1890 to
July 22,  1890 the defendant  is liable to the plaintiff for
his services as city  clerk.    That after the the organ-
ization of  the  *de-jure*  government  the  defendant  is
liable  to  the  plaintiff for  the  services  alleged  in  the
complaint  to  have  been  rendered,  unless  there  was,
during that time,  a  *de-jure*  city  clerk  performing the
duties of such  office.

It follows that the court below erred in sustaining the
demurrer to the  complaint.        ·

The cause is remanded to the court below with direc-
tions to over-rule the  demurrer  to  complaint  and  for
further proceedings in accordance with this opinion.

The judgment is reversed at the costs of appellee.

All the justices concurring.

On  petition for  rehearing in the foregoing  case the
opinion of the court was delivered by

BURFORD, J.:    The appellant  Blackburn  insists that
this court erred in its  application  and  construction  of
the ʌaw in the opinion in this case.

Counsel for appellant  has  favored  us  with  a  brief
which  evidences great research, industry and learning,
and which abounds with much sound reasoning

It is ably contended  that  certain laws,  statutes  and
enactments of  the  French  Republic,  the  territory  of
Indiana,  the  territory of  Missouri and  of  the  United
States were in force in this Territory during the period
that it was set apart as Indian country, and at the time
Oklahoma was settled by the whites in April,  1889.

But the reasoning of counsel leads them to an erone-
ous  conclusion  by  reason  of  being based  upon false
premises.

They contend that the provisions of the ordinance of

1787 for the government of the Northwest Territory were adopted and extended over the country now known as Oklahoma by the Act of Congress approved March 26, 1804. (2 Stat. at Large, 283.)

A brief review of the history of National legislation affecting this period will show the error of this position.

The act for the government of the territory of the United States, northwest of the Ohio river, was approved July 13, 1787, prior to the Louisiana purchase and at a time when the territory now included in Oklahoma did not belong to the United States.

Article 2 of the Act provides:

"And should the public exingencies make it necessary for the common preservation, to take any persons property, or to demand his particular services, full compensation shall be made therefor."

The appellant contends that this provision was in force in Oklahoma prior to the adoption of our organic act, and that his particular services were required and demanded, as an officer of the provisional government of Oklahoma City, and hence the present *de jure* city is bound to make compensation. By Act of Congress approved May 7, 1800, the Indiana Territory was created, comprising all the territory belonging to the United States west of a line running north from the Ohio river at a point opposite the mouth of the Kentucky river to Fort Recovery, and thence north to the Canadian boundary line, and said act guaranteed to the people of Indiana Territory all the rights, privileges and advantages granted and secured by the ordinance of 1787. At that time the Indiana Territory did not include or have jurisdiction over the region now known as Oklahoma.

The treaty with France for the cession of the Province of Louisiana, which included Oklahoma, was ratified October 21, 1803, received executive approval Oc-

tober 31, 1803, and formal possession was taken of the lands ceded on December 20, 1803. Up to that time the ceded lands had been under French dominion and laws, except a portion which a part of the time had been under Spanish control.

By Act, approved March 26, 1804, Congress divided the French purchase into two divisions, one of which was denominated the territory of Orleans, for which a territorial government was prescribed.

The other was designated the District of Louisiana, and included the portion of country now known as Oklahoma. For the District of Louisiana no form of government was provided, but section 12 of said act provides:

''The executive power now vested in the Governor of the Indiana Territory shall extend to, and be exercised in the said District of Louisiana. The governor and judges of the Indiana Territory shall have power to establish in the said District of Louisiana inferior courts and prescribe their jurisdiction and duties, *and to make all laws which they may deem conducive to the good government of the inhabitants thereof. Provided however*, That no law shall be valid which is inconsistent with the constitution and laws of the United States, or which shall lay any person under restraint or disability on account of his religious opinions, profession or worship; in all of which he shall be free to maintain his own and not burdened for those of another.''

Section 13 provides as follows:

''The laws in force in the said District of Louisiana at the commencement of this act, and not inconsistent with any of the provisions thereof, shall continue in force until altered, modified or repealed by the governor and judges of the Indiana Territory aforesaid.''

It will be observed that this act of congress did not extend the laws of Indiana Territory over the District of Louisiana, but on the contrary continues in force for a limited time the laws then in force in said district, and authorized the governor and judges of the Indiana Ter-

ritory to make such laws for said district as in their judgment might seem necessary and proper. The provisions of the ordinances of 1787 were not in force in, or, applicable to, the country now known as Oklahoma.

By act approved March 3, 1805, Congress provided a Territorial form of government for the District of Louisiana, and designated it the Territory of Louisiana. The laws then in force were continued in force until altered, amended or repealed by the territorial legislature.

Congress by Act approved June 4, 1812, enacted that the territory of Louisiana should thereafter be called Missouri, and by said Act a new territorial government was provided for said territory.

Section 14 of this act contains provisions similar to the ordinance of 1787, to-wit:

"If the public exingencies make it necessary for the common preservation to take the property of any person or to demand his particular services, full compensation shall be made for same."

This provision seems to have continued in force until the adoption of the constitution of the state of Missouri in 1820, and the admission of that state into the Union, when it disappears, and was by the change of government and the adoption of the constitution which received the assent of Congress, if not directly at least by implication repealed, so far as relates to the territory now known as Missouri.

When the lands now known as Oklahoma were set apart and ceded to the Creeks and Seminole Indians, and the whole Indian Territory set apart for the exclusive use and occupancy of the Indians, the laws made for the government of the whites were withdrawn from the Indian Territory or by treaty stipulation repealed, and ceased to operate in the Indian country. The settlement of the country by whites after the purchase of

the lands from the Indians and extinguishment of their rights, customs and laws, did not have the effect to re-invest the obsolete laws with any validity, force or effect.

The United States circuit court of appeals in *St. L. & S. F. Ry. Co. v. O'Laughlin. 49 Fed. Rep. 440,* in discussing this question say:

"There was no statute on any subject in operation in this territory outside of the Acts of Congress regulating intercourse with Indians and punishing offences against the United States. The laws of the territory of Mis-souri had no force or effect in the Indian country after the country ceased to be a part of such territory."

And this case is conclusive on this subject.

But were we to concede that the provision contended for by appellant was in force at the time this country was settled, and during the time he acted as recorder of the provisional government of Oklahoma City, we do not think his case would come within its provisions. There was no public exingency that made it necessary for the common preservation that he should fill the office * * * there was no power that could compel him to act. No law requiring public records to be kept * * * no authority for any one to employ him for such duties and no public necessity for his ser-vices. We are aware that Congress afterwards made certificates issued by the authorities organized by the people *prima facia* evidence of occupancy of town lots but in doing this, Congress did not specify or indicate any particular authority, but any authority, official or unofficial, private or public, that the public recognized, and the pursose was to avoid confusion and to enable the trustees to have some basis on which to operate in determining who were proper claimants, but there was no law making it the duty of Blackburn to issue certifi-cates of the character mentioned by Congress. The services of appellant were voluntarily performed—with-

out compulsion—for private gain and not for the pub-
lic in the sense contemplated by the ordinance of 1787,
and subsequent acts.   Under such circumstances it was
his duty to have looked to the persons for whom he
performed services for compensation at the time.

The contention of appellant is well founded that it
has been the policy of the United States and of the
several states generally to recognize and, through their
proper legislative authorities, make provision for the
payment of this class of claims against provisional ter-
ritorial and municipal governments.

If the legislature of Oklahoma had authorized these
debts to be paid and made provision for their payment,
their power in the premises would hardly be questioned,
but inasmuch as the legislature has not authorized the
payment of the claim, but, on the contrary, provided
that claims of this class shall not be paid, the courts
have not the power to compel their payment.   We find
nothing in the law entitling the appellant to a rehearing
in this case.

The petition for rehearing is overruled at costs of
appellant.

All the Justices concurring.