(No. 18820.—

DAVID J. EMERY, Appellant, *vs.* WILLIAM A. HENNESSY *et al.* Appellees.

*Opinion filed June 23, 1928—Rehearing denied October 6, 1928.*

THOMPSON, J., dissenting.

D. R. ANDERSON, for appellant.

ROBERT W. MARTIN, and DONOVAN, BRAY & GRAY, for appellees.

Mr. JUSTICE HEARD delivered the opinion of the court:

This is an appeal from a judgment of the county court of Will county declaring Hugh H. Bolten, Samuel E. Shepley, William S. Strohm and William A. Hennessy elected commissioners of the city of Joliet.

The city of Joliet was organized under the general Cities and Villages act and adopted the commission form of gov-

ernment. At a primary election held in the city on March 8, 1927, Hugh H. Bolton, Thomas C. Bothwick, John J. Cleary, William A. Hennessy, Samuel E. Shepley, William S. Strohm, Martin J. Whalen and David J. Emery were nominated for the four offices of commissioners, to be voted for at the April 19, 1927, city election. The city had previously been divided into fourteen election districts, numbered continuously from 1 to 14, and both the primary and the election were called by the city officers to be held in these fourteen districts. The city council, acting as a canvassing board, canvassed the returns of the election in the fourteen districts and declared Bolton, Hennessy, Shepley and Strohm elected commissioners, and they qualified as such. A petition was filed in the county court by Emery to contest the election, and all of the candidates were made defendants. The city clerk and the Joliet National Bank were also made defendants because of the fact that at the time of the filing of the petition the ballots and the returns were in the possession of the city clerk and in the vaults of said bank. While all of the candidates for commissioners were made defendants, it is conceded that Bolton, Shepley and Strohm were elected and that Bothwick, Cleary and Whalen were defeated. The contest is really only between Emery and Hennessy. The petition set out certain mistakes, illegal voting, alteration of ballots, duplicates of names on the poll-books and stuffing of the ballot-box, alleging fraud, particularly in the fifth election district, where it is alleged that there were 130 names duplicated on the poll-books, and that the election officers in the district made these duplications and also stuffed the ballot-box with ballots to correspond, and that illegal voting and other frauds were perpetrated with the knowledge of election officials, and that some of the acts of fraud were perpetrated by the election officials themselves in the fifth district.

The territory embraced in the fourteenth district was annexed to the city of Joliet by an ordinance of the city

passed and approved January 12, 1925. Hennessy, in his answer, set up that this annexation was not a valid annexation. Emery demurred to that portion of Hennessy's answer, and the demurrer was sustained. Repeated efforts were made by Hennessy during the progress of the hearing to raise the question of the legality of the annexation, but the trial court held that the annexation of the district could not be attacked collaterally in this suit. Prior to this proceeding a *quo warranto* proceeding had been instituted in the circuit court of Will county questioning the right and authority of the city of Joliet to exercise governmental power over the annexed territory, and the circuit court decided that the annexation was valid. An appeal had been taken to this court, and we had reversed the judgment and remanded the cause to the circuit court of Will county without directions. The cause was reinstated in the circuit court of Will county, and a rehearing having been had in that court, the circuit court again decided that the annexation was valid. A second appeal was then prosecuted to the Supreme Court, and on the 21st day of December, 1927, this court reversed the decision of the circuit court and entered judgment of ouster. (*People* v. *City of Joliet,* 328 Ill. 126.) At this time the instant case had been heard and was being held under advisement by the judge of the county court. On December 28, 1927, the court granted a motion made by Hennessy to re-open the case, and, over the objection of petitioner, Hennessy was permitted to prove the annexation of the fourteenth district to the city of Joliet, the various steps of such annexation, the decisions of the circuit and Supreme Courts in the *quo warranto* case, and other matters attacking the validity of the annexation. The trial court excluded both the fifth and fourteenth election districts from the count, the former on the ground of fraud and the latter on the ground that it was not a part of the city of Joliet at the time of the election, and found that

Hennessy had received 5609 votes and Emery 5384 votes, thus giving Hennessy a majority of 225 votes over Emery.

But two main questions are involved in this case—the action of the trial court in excluding the entire vote of the fifth district and in excluding the entire vote of the fourteenth district. Appellant contends that the trial court's action with reference to the fifth district was right, and that in excluding the fourteenth district it was wrong. Appellees' position is, that while there was fraud in the fifth district the entire vote should not have been excluded; that the illegal votes could be easily separated from the legal votes and the trial court should merely have purged the returns of the fraudulent votes, and that if that were done, even though the fourteenth district should be included in the count, Hennessy would still have a majority of 39 of the legal votes cast in the election. If the trial court was right in excluding the entire vote of the fifth district and was wrong in excluding the vote of the fourteenth district then Emery, and not Hennessy, was elected.

The undisputed evidence shows gross irregularities and frauds in the fifth district. In the poll-books 130 names were duplicated, and the ballot-box was stuffed by the election officials to at least a like extent. Certain public questions were voted upon at this same election. In the fifth precinct, after the ballots for officers were taken out of the regular ballot-box, a large number of ballots for officers, estimated by the witnesses at about 200, were taken out of the public question box and counted by the election officials. During the progress of the election, at different times election officials went into the booths and came back therefrom with a number of ballots and placed them in the ballot-box, and explained that they were public question ballots which had been left by the voters in the booths. The evidence conclusively shows that the election officials fraudulently marked a large number of ballots and placed them in the ballot-box. Forty-one ballots were in the box not initialed and 15 illegal

votes were cast in the precinct. When four of the election officials were called as witnesses in the case they refused to testify on the ground that it would tend to incriminate them. Appellees offered in evidence the record of the circuit court showing that on their plea of guilty four of these election officials were sentenced for their illegal conduct as election officers at the election in this precinct.

There is a distinction, in the nature of things, between particular illegal votes which may be proven and exactly computed, and the effect of fraudulently stuffing the ballot-box by the election officials. Where the election officials participate in such glaring frauds as were shown by the evidence to have been perpetrated in the fifth district no one can estimate or compute to what extent the entire poll was permeated by such fraud. Questions affecting the fairness of an election are of vital importance in this country, as popular self-government depends upon their proper solution. It seems clear that courts must abnegate the power of preserving the freedom of elections and abandon the polls to the violent and unscrupulous, or must take the ground that wherever such practices or influences are shown to have prevailed, not slightly and in individual cases but to such extent that they cannot be computed, the whole poll must be rejected. (*Patton* v. *Coates,* 41 Ark. 111.) The rule obtains in elections, as in other affairs, that a man shall not profit by his own wrong, nor by that of others done to allow him to reap the benefit. The only means by which approximate justice may be reached when the illegal acts render the result doubtful is to require the party to whose benefit they inure to purge the poll of their effect, or to suffer the penalty of having its majority excluded from his count of votes. (*Jones* v. *Glidewell,* 7 L. R. A. 31.) When the ballot-box becomes the receptacle of fraudulent votes the freedom and equality of elections are destroyed. That election is free and equal where all of the qualified electors in the precinct are carefully distinguished from the unquali-

fied and are protected in the right to deposit their ballots in safety and unprejudiced by fraud. That election is not free and equal where the true electors are not separated from the false, where the ballot is not deposited in safety or where it is supplanted by fraud. (*People* v. *Hoffman,* 116 Ill. 587.). The fact that the evidence does not show that Hennessy participated in the fraud does not authorize the court to award the certificate of election to him where the votes cast in a particular district are so tainted with fraud as to require their elimination and without them he has no claim to the office. The evidence shows clearly that the frauds perpetrated by the election officials in this district were perpetrated for the purpose of electing Hennessy. Where the election officials in a precinct participate in fraud to such an extent that it is impossible to determine the number of legal votes cast therein or for whom they were cast, the court will throw out and disregard that precinct and adjudge the election to the candidate receiving the highest number of legal votes cast in the other precincts in the territory in which the election was held. (*Weston* v. *Markgraf,* 328 Ill. 576; *Laird* v. *Williams,* 281 id. 233; *Brents* v. *Smith,* 250 id. 521.) Under the evidence in this case the county court was fully justified in rejecting the entire vote of the fifth precinct.

On January 12, 1925, the city of Joliet had authority of law to enlarge its territorial limits and annex territory by ordinance. On that day it attempted to exercise such authority and passed an ordinance annexing the territory known herein as district 14. On that day the lands now known as district 14 were such as might lawfully be annexed by the city of Joliet. No flaw appeared on the face of the annexation proceedings and in all respects they appeared to be perfectly regular and legal. After the passage of the ordinance the city of Joliet proceeded until December 21, 1927, to use its corporate franchise and exercise corporate powers over district 14. It is sufficient to con-

stitute a *de facto* municipal corporation that there shall exist a general law or special charter under which the corporation might be created, formed or organized, an attempt in good faith to incorporate or organize thereunder, and a subsequent actual user of the corporate franchise. (*Cooper v. Town of Valley Head*, 101 So. 874; *Morgan v. Independent School District*, 211 Pac. 529; *Coe v. City of Los Angeles*, 183 id. 822; *Lang v. Bayonne*, 68 Atl. 90; *White v. City of Quanah*, 27 S. W. 839.) When the attempted annexation proceedings were completed the municipal corporation of Joliet was *pro tanto* re-organized and district 14 became a constituent part of the re-organized *de facto* municipal corporation of Joliet, and the city itself was precluded from denying its corporate existence for the purpose of escaping liability or evading its obligations. (*People v. Ellis*, 253 Ill. 369.) The *de facto* municipal corporation could only be deprived of its authority to exercise the powers conferred by statute upon like *de jure* municipal corporations by a judgment of ouster in a proceeding in *quo warranto* brought by the State through its Attorney General or State's attorney. (*Village of Catlin v. Tilton*, 281 Ill. 601; *Aldridge v. Matthews*, 257 id. 202; *People v. Pederson*, 220 id. 554; *People v. Bowman*, 247 id. 276.) Until the existence of such *de facto* municipal corporation has been terminated by judgment of ouster, it may exercise upon the citizens, through its officers, the powers conferred upon it by the statute as fully and completely as if it were created by a law valid in every particular. (*Lang v. Bayonne, supra; Attorney General v. Town of Dover*, 41 Atl. 98; *Spear v. Kearney County*, 88 Fed. 749; *Riley v. Garfield Township*, 38 Pac. 560; *Franklin Avenue Savings Institution v. Board of Education*, 75 Mo. 408; *Blackburn v. Oklahoma City*, 1 Okla. 292; *Dubuque Female College v. Dubuque*, 13 Iowa, 555; *Nelson Consolidated Independent School District*, 181 id. 424; *City of Albuquerque v. Water Supply Co.* 24 N. M. 368; *Board of Education v. Berry,*

62 W. Va. 433; *Vanover* v. *Dunlap,* 189 S. W. 915.) The ordinances of the city of Joliet immediately upon the completion of the annexation proceedings became effective in district 14, (*People* v. *Chicago Telephone Co.* 220 Ill. 238; *People* v. *Cregier,* 138 id. 401; *Illinois Central Railroad Co.* v. *City of Chicago,* 176 U. S. 648;) and continued effective until December 21, 1927. The judgment of ouster in *People* v. *City of Joliet, supra,* did not adjudge that district 14 never was a part of the city of Joliet. It merely dissolved *pro tanto* its *de facto* municipal corporation. In other words, its effect was completely to extinguish and annihilate *pro tanto* the artificial municipal body which had theretofore existed under the name of the city of Joliet, together with its rights, liberties and franchises. Or, differently stated, its effect was the immediate death of the artificial being, followed by all the consequences which the law annexes to such a death. (*Dodge* v. *People,* 113 Ill. 491.) A judgment of ouster is not retroactive upon the rights acquired and liabilities incurred prior to such ouster. (22 R. C. L. p. 725.) The judgment of ouster in *People* v. *City of Joliet, supra,* merely ousted the city of Joliet from further exercising the rights and privileges of a municipal corporation over district 14. (*Gulf Lines Railroad* v. *Golconda Northern Railway,* 290 Ill. 384.) From the time of the annexation proceedings until December 21, 1927, the inhabitants of district 14 were subject to all the duties and liabilities of any other inhabitants of the city of Joliet. They could be compelled by the city to pay taxes and special assessments and their property could be taken from them by eminent domain for city purposes, and as private citizens they could not be heard in court to complain thereof. Being subject to the duties and liabilities of citizens they were naturally entitled to all the rights and privileges of such citizens. If the city authorities had not called the primary election and the city election in question to be held in the fourteenth district, the inhabitants of that district could have

by *mandamus* compelled the authorities to call the same. When called, the election was by law required to be conducted in the same manner as in other parts of the municipality. The election laws pertaining to the other portions of the municipality pertained alike to district 14. The qualifications for voting in district 14 were the same as in the other districts. Unlawful acts with reference to the election were punishable, and were punished in district 14, the same as in other districts. At the election 836 persons voted in district 14. Their status as voters must be determined as of the time when they exercised their right of electoral franchise and not as of some subsequent time. The fact that the 836 persons who voted at this election were not legal voters in this district on December 28, 1927, can have no effect upon their status as voters on April 19, 1927. The entire 836 might have died, removed from the district, lost their citizenship by enlisting in the army of some foreign country, as so many persons did during the World War, or become disqualified as voters in some other manner between April 19, 1927, and December 28, 1927, and yet no one would pretend that these facts would constitute any reason why their votes should not be counted if legal voters on April 19, 1927. To hold otherwise would create endless confusion. If these 836 persons did not have a right to vote on April 19, 1927, then they had no right to vote at the primary election or at any preceding election after the annexation, and it might well be that if their votes had not been cast at the primary election neither Hennessy nor Emery would have been nominated for commissioner, bonds and contracts of the city might be invalidated and the result of many public questions submitted at this and prior elections unsettled. At the time of the annexation proceedings the city of Joliet had thirteen districts. If instead of creating the fourteenth district out of the newly annexed territory the city council had divided this new territory in such manner that about 100 voters had been added to each of eight districts and

they had voted therein, to hold that their votes should not be counted upon a contest would render it absolutely impossible to determine the result of the election, as the majority of the districts of the city would be so tainted by illegal votes that it would be impossible to purge the poll and separate the legal from the illegal votes. Being possessed on April 19, 1927, of the qualifications of voters in the city of Joliet, and being entitled to all the rights and privileges of other citizens of the city of Joliet, these 836 persons who voted in district 14 had a right to vote there and to have their votes counted. Under the law, as soon as a majority of the votes are cast for a candidate at an election held in pursuance of law he becomes legally and fully entitled to the office, and his title is then complete and no subsequent act affects his right thereto. (*Mayfield* v. *Moore,* 53 Ill. 428; *People* v. *Sweitzer,* 280 id. 436.) The election of April 19, 1927, was complete on that date and its result was not affected by the judgment of ouster of December 21, 1927. The county court erred in refusing to count the votes cast in the fourteenth district.

Objection was made by appellees to a few ballots in this district. As these ballots could not affect the result if appellees' objections thereto were all sustained they will not be considered.

The judgment of the county court will be reversed and the cause remanded to that court, with directions to enter an order decreeing that Hugh H. Bolton, Samuel E. Shepley, William S. Strohm and David J. Emery were duly elected commissioners of the city of Joliet at the election held April 19, 1927.

*Reversed and remanded, with directions.*

Mr. JUSTICE THOMPSON, dissenting.