Roy Webb et al., Plaintiffs-Appellants, v. Benton Consolidated High School District No. 103, Franklin County, Defendant-Appellee.

(No. 69-106;

Fifth District—November 20, 1970.

EBERSPACHER, J., dissenting.

Frank E. Troubaugh, of West Frankfort, for appellants.

Elmer Jenkins, of Benton, for appellee.

Mr. PRESIDING JUSTICE MORAN delivered the opinion of the court:

This action was brought to contest an election held by the Benton Consolidated High School District No. 103 in Franklin County, Illinois on December 14, 1968 in which the proposition submitted to the voters of whether to issue bonds in the amount of $1,875,000.00 for the con-

struction of a new high school and gymnasium building was approved.

The voting took place in six precincts but the conduct challenged in this contest is alleged to have taken place only with respect to absentee ballots cast in Precincts No. 1 and No. 2. In Precinct No. 1 there were 1,457 Yes votes, 972 No votes including 199 absentee ballots. In Precinct No. 2 there were 147 Yes votes, 111 No votes including 10 absentee ballots. In Precincts No. 3 through No. 6 there were 192 Yes votes and 599 No votes. The canvass of the total votes showed 1,796 Yes votes and 1,682 No votes.

With respect to the absentee ballots cast in Precinct No. 1 the trial court found numerous violations of the statutes (Ill. Rev. Stat., 1967, ch. 46, par. 19—1, *et seq.*) governing the conduct of elections in the voting of absentee ballots, such as that the judges of the election in Precinct No. 1 made no attempt to compare the signatures on the application for absentee ballot with the signature on the ballot envelope at the time the ballot envelopes were opened and the ballots deposited in the ballot box; that the names of the absentee voters were not announced at the time the ballot envelopes were opened; that on nine ballot envelopes the signatures had not been notarized; that one voter notarized his own signature on the ballot envelope; that another ballot envelope carried the signature of a voter who was in Texas at the time his signature was notarized in Benton; that several ballots were signed outside the presence of the notary; that several absentee ballots were voted at Franklin Hospital only as a convenience to the voters when they could otherwise be present on election day; the eight unregistered voters were permitted to vote absentee ballots; that the names of the absentee voters were not entered in the poll book; and that the absentee voters list for posting was not posted in a conspicuous place in the high school where ballots were ordinarily picked up by voters.

In Precinct No. 2 ten absentee ballots were cast but these ballots were counted after the regular ballots were counted, the names of the voters were not announced, their signatures were not compared with their applications and the ballots were spread on the table for all the judges to see. All ten of these ballots were in favor of the proposition.

■■ Without further comment we concur with the findings of the trial judge that "when the evidence is fairly considered, it discloses that there were many and varied violations of the statutory procedures required in the voting of absentee ballots. These violations were of basic and fundamental rules for the protection of the integrity of the ballot and cannot be excused on the grounds that such rules are directory rather than mandatory; they are, in fact, the very type of conduct the statutes

are designed to prohibit. These violations were so extensive and the handling of absentee ballots so lax, that all absentee ballots must be found to be illegal."

Since the ten illegal votes in Precinct No. 2 were shown to be for the proposition, it is clear that the affirmative vote in that precinct should be surcharged accordingly; but since the 199 absentee ballots cast in Precinct No. 1 were commingled with the votes cast on the day of the election before any votes were counted, and there was no evidence to show how any single absentee ballot had been voted, it is impossible to determine with any degree of mathematical certainty how many of these votes were for or against the proposition.

The issue then becomes whether to apportion the illegal absentee ballots cast in Precinct No. 1 or to exclude the entire vote in that precinct. Appellants argue that where voting irregularities are so numerous and flagrant as shown with respect to the absentee ballots in Precincts No. 1 and No. 2, a presumption arises that similar irregularities occurred with respect to the other ballots cast in those precincts, and contend that these irregularities constitute fraud which permeates the entire vote in those precincts requiring under the rule of *Lehman v. Hill*, 414 Ill. 173, and *Emery v. Hennessy*, 331 Ill. 296, that the entire vote in those precincts be excluded. The trial court found that the evidence showed many violations of voting regulations but that the evidence "is totally lacking in any showing of illegal acts committed with the intent and purpose of stacking the vote for the affirmative of the proposition," and that the "wrongful acts involved in (*Lehman v. Hill* and *Emery v. Hennessy*) went far beyond those shown by this record and the facts of this case do not align it with the wholesale frauds and stuffing of the ballot boxes in those cases."

We find no evidence that any ballots cast at the polls on December 14, 1968 were irregular, that the illegality of the absentee ballots in any way affected the remainder of votes cast, that any absentee voter was influenced or coerced by any election official, or that any person was denied his right to vote, and we hold that the findings of the trial court are not contrary to the manifest weight of the evidence. *Armbrust v. Starkey*, 3 Ill.2d 131, *Park v. Hood*, 374 Ill. 36.

■■■ Where the portion of votes containing illegal ballots can be identified with certainty, and proof of irregularities in voting are not such as to justify a disenfranchisement of all voters in that precinct, it is proper to apportion the illegal ballots and surcharge the votes in that precinct accordingly instead of excluding the entire vote. (*Thornton v. Gardner*, 30 Ill.2d 234; *Drolet v. Stentz*, 83 Ill.App.2d 202.) Apportioning the 199 absentee ballots cast in Precinct No. 1 requires the deduction of 119.4

Yes votes and 79.6 No votes, and as previously stated, 10 absentee Yes votes must be deducted from the Yes votes cast in Precinct No. 2 with the result that the proposition was carried by a margin of 64.2 votes.

Accordingly, the judgment of the Circuit Court of Franklin County is affirmed.

Judgment affirmed.

GOLDENHERSH, J., concurs.

Mr. JUSTICE EBERSPACHER, dissenting:

I am of the opinion that the irregularities that occurred with reference to the absentee ballots in Precinct No. 1 were of such gross and fraudulent nature that the 199 absentee ballots should not be apportioned and that the disregard of the legislative directives for the assurance of a free and equal election by those admitted proponents of the proposition should result in the exclusion of the votes in Precinct No. 1 with the result that the total vote be surcharged to the results in the other 3 precincts.

The trial court in finding that the evidence "is totally lacking in any showing of illegal acts committed with the intent and purpose of stacking the vote for the affirmative of the proposition" completely ignores uncontradicted evidence of gross and designed disregard of the provisions of the statute (ch. 46, par. 19—1 to 19—4) for absentee voting for the admitted purpose of "stacking the vote" for the proposition.

A doctor,—school board member participated in the voting of 74 allegedly incapacitated voters by signing the affidavits of incapacitation (in many instances they were not his patients and were not examined by him) without the knowledge of the voter. According to his own testimony he "was a member of the School Board trying to put the election over" and "I electioneered in favor of the election. I encouraged them to vote "yes". I was sold on it and I did everything I could to put it over". He further testified with reference to a school secretary-election judge whom the evidence showed presented applications and ballots to the incapacitated voters in the hospital and returned the voted ballots to the school, "she had the ballots there".

That finding furthermore, completely ignores the uncontradicted testimony of a hospital technician who "actively campaigned for the bond issue" who through a school superintendent arranged for hospital employees to vote at an office in the hospital regardless of whether anticipated absence on election day qualified them to vote absentee and who testified that the school superintendent sent a secretary in the school office who served as a judge of the election and another school employee,

both of whom testified they were working for the proposition, "to do the right thing about getting these people to vote and things like that * * *. They came one time and brought the corresponding papers. I called each individual or the people who had asked me that they wanted to vote, I called them so that they could fix the papers or whatever it might be. This was done at the hospital. We didn't have a booth for them to vote in. They voted right there at the desk. I didn't see how they voted. I don't think these two ladies saw how they voted. I am afraid to tell you the number of hospital people who voted that way". The witness then admitted that certain named hospital employees voted in that manner and when asked, "How many more?" stated he did not know. From evidence presented by other witnesses the employees were called to come to the hospital office and vote by the technician when the ladies with the ballots arrived.

There is also uncontradicted evidence that applications, affidavits of absent voters and ballots were made available to school employees who were proponents of the proposition to take to residents to vote, and that there were numerous instances of such voting; in fact it is a fair inference from the evidence that ballots were made available to any proponent but were not made available to opponents for purposes of voting absentee. In one instance a hospital patient who was solicited to vote was denied the necessary papers and ballot upon advising the solicitor that he was against the proposition.

While the proponents who engaged in the absentee voting were more subtle than were the participants described in *Lehman v. Hill*, 414 Ill. 173, 111 N.E.2d 120, their conduct was no less fraudulent and their motivation was obviously to "stack the vote" for the affirmative. Here there was a complete disregard and defiance of the mandatory provisions our Legislature has made to govern the privilege, not the right, to vote absentee. Ch. 46, sec. 19—1 to 19—14, Ill. Rev. Stat. See also, *Clark v. Quick*, 377 Ill. 424, 36 N.E.2d 563 at 565—7.

Of the 199 absentee ballots cast in Precinct 1; 82 were voted upon affidavit and application of incapacitated voters including 74 which were voted under the supervision of the doctor—school board member and school secretary—election judge, both of whom admittedly were doing all they could to put the election over. Seventy-eight ballots were voted "in person", including the hospital employees who voted at the office in the hospital pursuant to the arrangements for polling there, made by the hospital technician, a school superintendent and the secretary—election judge, also including a number of absentees solicited by the secretary—election judge and other school employees who had access to the ballots, in their homes and there voted, and also including

those who voted absentee at the school offices. The school superintendent who in lieu of the Secretary of the School Board was in charge of the election, by a verbal authorization, did not know how many ballots or applications he received from the printer; kept the ballots in the safe where he "and the young ladies had access to them", and testified that 39 absentee votes were cast in person at the school. This leaves 39 of the ballots considered to have been voted "in person", which were voted at some other place but returned to the school by those who solicited them. An additional 39 absentee ballots were returned by mail; these 39 with the 39 actually voted in person at the school, a total of 78 of the 199 absentee ballots, being the only absentee ballots cast in Precinct 1 of which there was no evidence of fraud or disregard of the statutes for absentee voting.

I concur in the finding that the "violations were so extensive and the handling of absentee ballots so lax, that all absentee ballots must be found to be illegal" and am of the further opinion that since they were commingled with ballots cast by the voters on election day, that they should not be apportioned, simply because their number is known. Apportionment assumes that the 199 illegal ballots were voted in the same proportion for and against as were the ballots cast by the voters on election day; an assumption not justified by the evidence. The only fair inference from the evidence is that of the 199 illegal absentee ballots 121 (199 less the 78 of which there was no evidence of irregularity) were voted for and against in a proportion similar to that of the absentee ballots in Precinct 2 where the absentee vote was 10 for and 0 against. In determining the apportionment the majority used 1457 "yes" votes and 974 "no" votes including the 199 illegal ballots. As a result the "yes" vote is "loaded" with the "yes" voted included in the 199 illegal votes.

The factual situation here is in marked contrast to that found in *Thornton v. Gardner*, 30 Ill.2d 234, 196 N.E.2d 723, where "irregularities in voting at the wrong poll were not such as to justify the disenfranchisement of all the voters". There seven votes, voted in the wrong polling place, were deducted on a pro rata basis; there was no evidence of the 7 votes being cast to stack the results, nor does it appear that charges of fraud were made or proved.

In *Drolet v. Stentz*, 83 Ill.App.2d 202, 227 N.E.2d 114, the Court said there was no actual fraud charged or established but declined to apportion the votes in Pembroke No. 2. There is language in that opinion to the effect that the reason for not apportioning was because the legal votes cast for either party could not be determined; there however, the Court said:

"The gross disregard for numerous simple and plain statutory re-

quirements should not under these circumstances be judicially condoned. We therefore conclude that the election in that precinct is abortive. It is better that the voters in one precinct in one election be disenfranchised than that a judicial key to fraud and chicanery be molded or that the temptation to ignore the legislative directives for the assurance of a free and equal election be encouraged. The trial court correctly excluded the votes in Pembroke No. 2 and surcharged the final for each party accordingly".

In my opinion the quoted principles and practice there enunciated should be applied in the present case.

While one of the facts necessary in order to have an apportionment of illegal votes is that the number of illegal votes to be apportioned can be precisely determined, that is not the sole test. Apportionment should not be used where fraud has been proved and participated in by an election official or where the violations of the statutes or disregard of the election laws involves a designed attempt to stack the vote. In my opinion the authorities cited, along with many others cited in those authorities supports such conclusion.