No. 2--97--0978 

________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

________________________________________________________________

In re
 THE PURPORTED ELECTION ) Appeal from the Circuit Court

OF BILL DURKIN ) of Lake County.

  )

(Newton Finn, Petitioner- ) No. 97--MR--195

Appellant, v.  William Durkin,  )

a/k/a Bill Durkin, as           )

purported Mayor-elect of        )

Waukegan, Illinois; William     )

Durkin, Sam Filippo, and Brian  )

Grach, as members of the        )

Canvass Board of the City of    )

Waukegan, Illinois; Willard     )

Helander, as Clerk of Lake      )

County, Illinois; Lawrence      )

TenPas, a/k/a Larry TenPas; and )

Sam Filippo, as City Clerk of   )  Honorable

Waukegan, Illinois,             )  Maureen P. McIntyre,

Respondents-Appellees). ) Judge, Presiding.

________________________________________________________________

JUSTICE HUTCHINSON delivered the opinion of the court:

Petitioner, Newton Finn, appeals from the dismissal by the circuit court of Lake County of his petition to contest an election (the petition).  The petition contested the election of respondent William Durkin, a/k/a Bill Durkin, as mayor of Waukegan, Illinois, in the general election held on April 1, 1997 (the election).  In addition to Durkin in his capacity as mayor-elect, the petition named as respondents Durkin, Sam Filippo, and Brian Grach, as members of the Canvass Board of the City of Waukegan; Willard Helander, as clerk of Lake County; Filippo, as city clerk of Waukegan; and Lawrence TenPas, a/k/a Larry TenPas.

According to a certified canvass of the election results that was attached to the petition, Durkin was the winning mayoral candidate in the election with 4,296 total votes to petitioner's 4,260 total votes.  The canvass showed that TenPas, who was also a candidate for mayor in the election, received a total of 1,069 votes.  TenPas did not actively participate in the election contest proceedings.

The allegations in the petition included the following.  In the election, petitioner was an independent candidate for mayor;  Durkin was the Democratic candidate; mistakes or irregularities in the counting or return of votes were made in the election; 

"[t]hese mistakes or irregularities entailed the illegal counting of purported absentee ballots cast by purported absentee voters whose purported applications for absentee ballots failed to indicate why they could not be at the polling place on election day or indicated that they were 'physically incapacitated' without specifying the reasons for their incapacity";

there were (according to precinct-by-precinct tabulations attached to the petition) 256 such illegal absentee ballots; because absentee ballots were mingled with all precinct ballots, it was not possible to ascertain the specific candidate for whom the illegal absentee ballots were cast; therefore, "all illegal absentee ballots must be apportioned among respective mayoral candidates in each precinct according to the percentages of the total vote that each candidate received in that precinct"; after apportioning the illegal votes in this way, and after recounting the resulting legal votes, petitioner was the true election winner.

The petition sought a declaration that the challenged absentee votes were illegal and should not have been counted, an allocation of the illegal absentee ballots among the candidates in the election, a recount of the resulting legal votes, and a declaration that petitioner was the winner of the election.  Arguing that the relevant statutory provisions manifested a legislative intent that election contests proceed with dispatch to a conclusion, petitioner also filed a motion for a swift disposition of the matter.

Durkin and the Canvass Board responded to the petition by filing separate motions to dismiss the petition pursuant to section 2--619 of the Code of Civil Procedure (the Code) (735 ILCS 5/2--619 (West 1996)).  Helander filed an answer to the petition.  TenPas did not respond and was subsequently defaulted.

On July 8, 1997, at a hearing on the matter, the trial court determined that 185 of the 256 challenged absentee ballots were  legal and should have been counted.  With respect to those 185 ballots, the trial court entered an order granting the motions to dismiss.  We will present additional facts where relevant to our discussion of the issues.

We turn first to the nature of appellate review of a trial court's dismissal of a complaint pursuant to section 2--619.  The purpose of section 2--619 is to allow for the disposition of questions of law and easily proved fact issues at the outset of the case.  See, 
e.g.
, 
Zedella v. Gibson
, 165 Ill. 2d 181, 185 (1995).  Section 2--619(a)(9) permits involuntary dismissal where "the claim asserted *** is barred by other affirmative matter avoiding the legal effect of or defeating the claim."  735 ILCS 5/2--

619(a)(9)(West 1996).  A trial court ruling on a section 2--619 motion should consider the "pleadings, depositions, and affidavits."  
Zedella
, 165 Ill. 2d at 185.  Finally, we conduct an independent review of the propriety of dismissing the complaint and, therefore, are not required to defer to a trial court's reasoning.  
In re Chicago Flood Litigation
, 176 Ill. 2d 179, 189 (1997).

On appeal, petitioner first contends that the trial court erred when it determined that the 185 absentee ballots were legal and should have been counted.  The facts relevant to this issue are essentially undisputed.  The issue of the legality of these ballots centers on the applications for the absentee ballots submitted by the voters who cast these ballots.  The absentee ballot applications in question listed seven different choices for the voter’s absence from the polling place on election day.  On the back of the applications, several "INSTRUCTIONS FOR COMPLETING THE APPLICATION" were listed.   The first of these instructed the voter to "[c]heck one of the seven reasons why you will not be able to vote at your polling place."  One of the seven reasons on the front of the application was "I am physically incapacitated."  Nothing else, such as the word "reason(s)" or a nearby blank space, directed the voter to indicate the reason(s) for the physical incapacity.

On each of the absentee ballot applications submitted for the 185 absentee ballots in question, the voter checked the "physically incapacitated" choice, but did not indicate any reason for the physical incapacity.  Petitioner asserts that the trial court erred in determining that the 185 absentee ballots cast by the voters who completed these absentee ballot applications were legal because the Election Code (10 ILCS 5/1--1 
et
 
seq
. (West 1996)) requires a voter applying for an absentee ballot on the basis of physical incapacity to specify the reason(s) for the incapacity.

Section 19--3 of the Election Code (10 ILCS 5/19--3 (West 1996)) governs application forms for absentee ballots.  Section 19-

-3 provides that "application for ballot shall be substantially in the following form" and sets out sample absentee ballot application forms.  See 10 ILCS 5/19--3 (West 1996).  Section 19--3 contains several examples of forms to be used when the voter expresses a specific reason for absence from the polling place.  One of these reason-specific forms is entitled "APPLICATION FOR BALLOT BY PHYSICALLY INCAPACITATED ELECTOR."  See 10 ILCS 5/19--3 (West 1996).  This sample form provides, in relevant part, "I shall be physically incapable of being present at the polls *** for the following reasons[.]"  10 ILCS 5/19--3 (West 1996).

Section 19--3 also sets out a sample form entitled "APPLICATION FOR ABSENT VOTER'S BALLOT."  See 10 ILCS 5/19--3 (West 1996).  This form is nonreason-specific in that it lists several different reasons for the voter’s absence and directs the person completing the form to "Check One" of the reasons.  See 10 ILCS 5/19--3 (West 1996).  One of the choices is "I am physically incapacitated" followed, on the next line, by the word "Reason(s)" and a blank space.  See 10 ILCS 5/19--3 (West 1996).

Petitioner contends that section 19--3 requires a person applying for an absentee ballot on the basis of physical incapacity to specify the reason(s) for the incapacity, and that, because this requirement is mandatory, an application that fails to specify the reason for the incapacity renders the related absentee ballot illegal.  In support of this position, petitioner relies on 
People ex rel. Ciaccio v. Martin
, 220 Ill. App. 3d 89 (1991), which appears to be the only case that has directly addressed this issue.

In 
Ciaccio
, the reviewing court stated that the only issue on appeal was "whether the trial court erred in finding mandatory the requirement that a voter applying for an absentee ballot based on physical incapacity state the reason for that incapacity."  
Ciaccio
, 220 Ill. App. 3d at 90.  Citing the language of section 19--3, perjury provisions in the Election Code, and legislative concerns for the security of the electoral process, the 
Ciaccio
 court held that the requirement was mandatory and affirmed the judgment of the trial court.  
Ciaccio
, 220 Ill. App. 3d at 92.

In this case, the trial court distinguished 
Ciaccio
 and decided that it was not controlling for two reasons.  First, the trial court noted that, unlike the absentee ballot applications used in 
Ciaccio
, the absentee ballot applications used in this case did not indicate that the applicants should specify the reason for their physical incapacity.  Second, the trial court noted that, unlike 
Ciaccio
, where there were allegations of voter fraud, there were no allegations of voter fraud in this case.  Because of these differences, the trial court ruled that 
Ciaccio
 did not require a finding that the absentee ballots in this case were illegal.  The trial court reasoned that it would be unfair to disenfranchise the voters in this case because they did nothing wrong.

Petitioner asserts that the trial court erred in its ruling.  Acknowledging that exceptions exist to the otherwise mandatory provisions of the Election Code, petitioner argues that no such exception applies in this case.

We agree with petitioner that 
Ciaccio
 correctly determined that the requirement that a voter applying for an absentee ballot on the basis of physical incapacity must specify the reason for the physical incapacity on the application form is a mandatory requirement under the Election Code.  Moreover, it is undisputed that the applicants for the 185 absentee ballots at issue in this case did not satisfy this mandatory requirement.

Nonetheless, in light of the facts of this case, we believe that the trial court correctly decided that it would be improper to disenfranchise the voters in question by declaring their absentee ballots illegal.  As the trial court noted, a significant difference between 
Ciaccio
 and this case is that the application forms in this case, unlike the forms in 
Ciaccio
, did not indicate in any way that the applicant should specify the reason for his or her physical incapacity.  Petitioner's argument that the applicants should have known that they were required to specify the reason for their incapacity is unpersuasive.  Section 19--3 provides that an application for an absentee ballot "shall be made on blanks to be furnished by the election authority."  10 ILCS 5/19--3 (West 1996).  Thus, the responsibility for preparing proper absentee ballot application forms falls on the election authority, not on the individual voter.  We believe that it is simply asking too much of voters to require them to make sure that the forms they complete when they apply for an absentee ballot meet the requirements of the Election Code.  This is particularly so when the election authority is charged with ensuring that the forms are correctly prepared.

We realize that the forms used in this case were not correctly prepared.  We certainly do not condone the use of incorrectly prepared forms.  However, where the forms are incorrectly prepared by the election authority and the voters who completed the forms did nothing wrong in completing the incorrectly prepared forms it is unfair to disenfranchise the voters.  See 
Craig v. Peterson
, 39 Ill. 2d 191, 196 (1968) (error to disenfranchise voters on basis of otherwise mandatory election requirements where not voters' fault
).

We also agree with the trial court that this case is distinguishable from 
Ciaccio
 because in this case no fraud was alleged, while in 
Ciaccio
 fraud was a factor.  Fraud was at least implicit in the 
Ciaccio
 court's recital that the vote of the daughter of one of the candidates in the contested election 
was illegal because the daughter was not a resident where she voted for her father.  
Ciaccio
, 220 Ill. App. 3d at 92.  We also note that the trial court stated that its research revealed that in 
Ciaccio
 the same person had written 24 of the 25 challenged absentee ballot applications in that case.  In this case, there was no allegation of fraud of any kind related to the absentee ballots.  Where no question of fraud or tampering is presented, a court may determine that otherwise mandatory election requirements are only directory.  
Craig
, 39 Ill. 2d at 197.

For these reasons, we deem the mandatory requirements are overcome by the equitable principle of disenfranchisement avoidance.  Accordingly, we hold that the trial court did not err when it decided that the 185 absentee ballots in question were legal and should have been counted.  See 
Pullen v. Mulligan
, 138 Ill. 2d 21, 47 (1990) (literal compliance with directory provisions of Election Code not required).

Petitioner next contends that the trial court erred when it decided that the party affiliation method of allocating illegal votes should not be used in this case.  This issue involves the 71 of the 256 absentee ballots challenged by the petition in which the applicants for the absentee ballots did not check any of the reasons on the application form as to why they could not be at the polling place.  Because the applicants did not check any reason, the trial court ruled that the 71 absentee ballots were illegal and should not have been counted.  Neither party disputes that ruling.  Rather, the parties dispute how the illegal votes should have been allocated between them.

On July 8, 1997, the trial court ruled that the 71 ballots were illegal.  When it made this ruling, the trial court had not calculated how its ruling would affect the ultimate vote count of the election.  The trial court directed the parties to calculate the effect of the ruling, including how to allocate the illegal votes between petitioner and Durkin.

On July 11, 1997, petitioner filed a motion to amend his petition. The motion sought to amend the petition so that the illegal absentee ballots would be allocated between the parties both according to the percentages of the total vote that each candidate received in precincts where the illegal votes were cast, as urged in the original petition, and "according to political party membership."  The motion stated that a list of voters who participated in the election for mayor had been prepared after the original petition was filed and that based on that list, a copy of which was attached, 51 of the 71 absentee voters whose votes were determined to be illegal had declared their political party membership as Democrats in a primary election held on February 25, 1997.  The motion asserted that this established political party affiliation for those voters and allowed the use of the party affiliation method in allocating their illegal votes.

Attached to his motion to amend the petition was petitioner's proposed allocation of the 71 illegal votes. The proposed allocation first allocated 51 of the 71 illegal votes against Durkin, using the party affiliation method of allocating illegal votes.  In petitioner's view, this allocation was appropriate because 51 of the voters who cast the 71 illegal votes had been determined by the voting lists to have voted Democratic in the primary election.  On the basis of this evidence of party affiliation, petitioner asserted that these 51 of the 71 illegal votes should be deducted from Durkin's vote total because Durkin was the Democratic candidate in the general election.

Petitioner's proposed allocation of the 71 illegal votes next used the proportion method of allocating illegal votes to allocate the 20 remaining illegal votes.  The proposal allocated the 20 votes among the candidates according to the percentages of votes each candidate received in the precincts in which these votes were cast.

By petitioner's reckoning, the net effect of his proposed allocation was a lowering of Durkin's vote total to 4,232 votes and a lowering of petitioner's vote total to 4,254 votes.  Thus, according to petitioner's proposed allocation of the 71 illegal votes, he was the winner of the election.

On July 16, 1997, the trial court granted petitioner leave to file an amended petition to add the proposed use of the party affiliation method to allocate any illegal votes.  This was the second time that petitioner was allowed to amend the petition.  Petitioner had previously amended the petition to join an additional respondent.

On August 18, 1997, Durkin and the Canvass Board filed a joint proposed allocation of the 71 illegal votes.  Their proposed allocation apportioned the 71 illegal votes between petitioner and Durkin on the basis of the percentage of votes each candidate received in the precincts where the illegal votes had been cast, 
i.e.
, by using the proportion method to allocate the illegal votes.  According to this proposed allocation, Durkin would lose 49.8675 votes and petitioner would lose 17.7329 votes.  This would lower Durkin's total votes received to 4,246.1325 votes and petitioner's total votes received to 4,242.2671 votes.  Thus, according to the proposed allocation of the 71 illegal votes submitted by Durkin and the Canvass Board, Durkin was still the winner of the election by slightly less than 4 votes.

On August 29, 1997, following a hearing on the matter, the trial court decided that it would be improper to use the party affiliation method to allocate any of the illegal votes.  The court commented that none of the cases relied on by petitioner in which the party affiliation method had been used involved an independent candidate.  The court reasoned that these cases were not controlling where, as in this case, an independent candidate was involved.

At the same hearing, the trial court also determined that it was appropriate to use the proportion method to allocate all of the 71 illegal votes.  Petitioner conceded that the calculations made by Durkin and the Canvass Board in their proposed allocation using the proportion method were correct. The trial court determined that, after applying the proportion method of allocating the 71 illegal votes, the results showed that Durkin received 4,246.1325 votes and petitioner received 4,242.2671 votes.  On September 19, 1997, the trial court entered an order enforcing these determinations.

On appeal, petitioner contends that the trial court erred when it decided that the party affiliation method should not be used to allocate any of the 71 illegal votes.  Petitioner argues that the presence of an independent candidate should not change the rule allowing the use of party affiliation to determine the candidate for whom illegal votes were cast and the allocation of those illegal votes against that candidate.

It is well established that a court may use party affiliation to determine the candidate for whom illegal votes were cast and, when such votes have been identified, to allocate such illegal votes against that candidate by deducting them from that candidate's vote total.  See, 
e.g.
, 
Talbott v. Thompson
, 350 Ill. 86, 97-98 (1932) (party affiliation raises presumption voter cast ballot for nominee of her or his political party, and presumption determines for whom ballot was cast in absence of countervailing evidence); 
Leach v. Johnson
, 20 Ill. App. 3d 713, 718-19 (1974) (absent better evidence, party affiliation is best evidence for determining candidate for whom illegal vote was cast).  This is the party affiliation method of allocating illegal votes.

It is also well established that, when the evidence does not disclose the recipient of illegal votes, such votes should be eliminated by allocating them to the candidates in the same proportion that each candidate received votes in the precincts where the illegal votes were cast.  See, 
e.g
., 
Thornton v. Gardner
, 30 Ill. 2d 234, 236 (1964); 
Flowers v. Kellar
, 322 Ill. 265, 269 (1926).  This is the proportion method of allocating illegal votes.

In this case, petitioner contends that the party affiliation method should be used to eliminate 51 of the 71 illegal votes in question by allocating them to Durkin, the Democratic candidate in the general election.  Petitioner bases this contention on voting lists that, petitioner asserts, show that 51 of the 71 voters who cast the illegal votes in the general election voted in the primary election as Democrats.  Petitioner also contends that the proportion method should be used to allocate the remaining 20 illegal votes between the candidates.  Precedent exists for such a combined use of the two methods.  See 
Choisser v. York
, 211 Ill. 56, 60 (1904).  However, respondents contend that a court should not use the party affiliation method to allocate illegal votes where, as here, one of the major candidates is an independent candidate.

We agree with respondents.  Using the party affiliation method in this case would be unfair because, as the trial court noted, only candidates affiliated with a political party can lose votes when this method is applied, while an independent candidate cannot lose votes.  Of course, if the party affiliation method reliably determined the candidate for whom the illegal votes were cast, its  use would be appropriate.  
Talbott
, 350 Ill. at 96-97.  However, we believe that the circumstances of this case cast doubt on the reliability of the party affiliation method in determining the candidate for whom the illegal votes were cast.  We believe that determining party affiliation, and therefore how votes were cast, in a general election that includes a strong independent candidate based on the voting records from a previous primary election in which the independent candidate did not participate, as in this case, is not a reliable method of determining how votes were cast.  Because the independent candidate did not participate in the primary election, voters in that election did not have a chance to vote for the independent candidate at that time.  Based on the strong showing of petitioner, the independent candidate for mayor in the general election, it is reasonable to conclude that many of the voters who participated in the primary election split their tickets and voted for the independent candidate in the general election.  Without evidence of the numbers of such voters, the party affiliation established by the primary election records is unreliable.

The trial court correctly noted that none of the cases cited by petitioner in the circuit court proceedings involved an independent candidate.  This is also true of the cases cited by petitioner on appeal.  It follows that these cases are not controlling in this case.

 For these reasons, we conclude that the trial court correctly decided that the party affiliation method should not be used to allocate any of the illegal votes in this case.  There was no other evidence as to the candidates for whom the illegal votes were cast.  The trial court also correctly decided that the proportion method should be used to allocate the 71 illegal votes.  Because the parties do not dispute the accuracy of respondents' calculations using the proportion method, the trial court did not err when it accepted respondents' proposed allocation of the 71 illegal votes. 

Lastly, petitioner contends that the trial court erred when it denied his motion for leave to file a first amended petition.  Petitioner filed his original petition to contest the election on April 14, 1997.  On July 28, 1997, petitioner filed a motion for leave to file a first amended petition.  The motion stated that the amended petition would raise three new points of contest: (1)  alleged additional omissions in 128 of the 185 challenged absentee ballots based on physical incapacity; (2) instances of illegal assisted voting and other voting irregularities; and (3) allegations of illegal conduct by Durkin.  Following a hearing on the matter, the trial court denied the motion.

The original petition consisted of a single count that alleged that 256 of the absentee ballots cast in the election were illegal.  Petitioner asserted in the original petition that 185 of these ballots, which were all based on physical incapacity, were illegal because the applicants for the ballots did not specify the reason for the physical incapacity.  We have already established that the trial court correctly determined that the 185 ballots were not illegal on that ground.  In count I of his proposed first amended petition, petitioner asserted that 128 of the same 185 ballots were illegal for a different reason. Petitioner asserted that the ballots were illegal because the applicants left blank a space on the application form for length of residency at the purported voter's address.

The proposed first amended petition also contained two new counts and completely new allegations.  Count II alleged that 131 votes in various precincts were illegal either because of improper assistance in voting or because of improper initialing of ballots by election judges.  Count III alleged that a mailing by Durkin, five days before the primary election, improperly caused many eligible voters to refrain from voting in both the primary election and the general election.

Before ruling on petitioner's motion, the trial court made extensive comments on the matter.  The trial court initially stated that it had reviewed all of the cases cited by both parties and that those cases liberally allowed amendment of pleadings in election contest proceedings where the amendment would cure deficiencies in the original pleadings.  The court then stated that the proposed first amended petition in this case did not purport to correct deficiencies in the original petition.

The trial court next discussed each count in the proposed first amended petition.  The trial court determined that the information on which each proposed amendment was based had been available to petitioner when he filed the previous motions to amend his petition.  The trial court concluded that petitioner had had ample prior opportunities to amend his petition, as proposed in the first amended petition, but had not done so.  The trial court  stated, "[A]ctually what has been happening here is that the petitioner has been waiting to see what the Court would do and instead is responding to adverse rulings which I believe the case law does not allow."

On September 26, 1997, the trial court entered an order denying petitioner’s motion for leave to file a first amended petition.  The same order stated that, based on the trial court’s prior rulings, the petition to contest the election was moot.  Finally, the order stated that the vote tally reflected in its previous order would stand and that Durkin was "therefore the mayor of Waukegan."

On appeal, petitioner contends that the trial court abused its discretion when it denied his motion for leave to file a first amended petition.  Petitioner acknowledges that he was allowed to make two prior amendments to the face of his original petition.  However, he asserts that he was improperly denied an opportunity to change his cause of action or to add new causes of action before a judgment was entered against him on the pleadings.

Illinois courts are encouraged to freely and liberally allow the amendment of pleadings.  735 ILCS 5/2--616 (a) (West 1996); 
Lee v. Chicago Transit Authority
, 152 Ill. 2d 432, 467 (1992).  It is well established that this principle applies to election contests.  See, 
e.g
., 
Dale v. Irwin
, 
78 Ill. 170, 176, (1875).  Nonetheless, a party’s right to amend is not absolute, and the decision whether to grant leave to amend a pleading rests within the sound discretion of the trial court.  
Lee
, 152 Ill. 2d at 467.  This court's standard of review is such that, absent an abuse of discretion, we will not disturb a trial court’s decision regarding the amendment of pleadings.  
Lee
, 152 Ill. 2d at 467.

Among the factors to be considered in determining whether or not to permit an amendment to the pleadings are whether the amendment would cure a defect in the pleadings; whether the other party would be prejudiced or surprised by the proposed amendment; the timeliness of the proposed amendment; and whether previous opportunities to amend the pleadings existed.  
Lee
, 152 Ill. 2d at 467-68.  A court may also consider whether the party seeking to amend offers good reasons for not seeking to amend earlier.  
Johnson v. Abbott Laboratories, Inc.
, 238 Ill. App. 3d 898, 904 (1992).

In this case, the trial court determined that petitioner’s proposed amendments did not cure a defect in the original petition.  The trial court also determined that petitioner had previous opportunities to amend his petition to include the proposed amendments but did not do so.  The trial court’s comment that petitioner’s proposal to amend was a response to adverse rulings indicates that the trial court also determined that petitioner did not have a good reason for not previously proposing the amendments.

In his appellate brief, petitioner does not deny that he had the information on which he based the proposed first amended petition when he was allowed to make two previous amendments to the original petition.  Rather, he simply asserts that he should have been allowed the opportunity to amend his cause of action and add new causes of action because no judgment had been entered on the pleadings.  Based on this record, and in the context of an election contest, where, as petitioner himself urged when he filed his petition, matters should proceed with dispatch to a conclusion, we find that the trial court did not abuse its discretion when it denied petitioner’s motion for leave to file a first amended petition.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

BOWMAN and RAPP, JJ., concur.