SECOND DIVISION

March 31, 2005

(
Nunc
 
pro
 
tunc
 December 28, 2004)

No. 1-03-2528

MICHELLE MARKIEWICZ QUALKINBUSH, 

Petitioner-Appellee, 

v.

GREGORY SKUBISZ, 

Respondent-Appellant,

(David Orr, as Cook County Clerk,  Dominick Gigliotti, Michelle Markiewicz Qualkinbush, Robert Fioretti, as the Calumet City Canvassing Board, Dominick J. Gigliotti and Nick Manousopoulos,

Respondents).

GREGORY SKUBISZ,

Counterpetitioner,

    v.

MICHELLE MARKIEWICZ QUALKINBUSH, as Calumet City Clerk, DAVID ORR, as Cook County Clerk, and the CITY OF CALUMET CITY,

Counterrespondents.

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from the 

Circuit Court of

Cook County.

Honorable

Michael J. Murphy,

Judge Presiding.

PRESIDING JUSTICE BURKE delivered the opinion of the court:

Respondent and counterpetitioner Gregory Skubisz
(footnote: 1) appeals from an order of the circuit court certifying the April 1, 2003, mayoral election results for Calumet City in which the court declared petitioner and counterrespondent Michelle Qualkinbush mayor.  On appeal, Skubisz contends that the trial court erred in failing to dismiss Qualkinbush's petition for election contest on the basis that section 19-6 of the Election Code (10 ILCS 5/19-6 (West 2002)), the absentee ballot return provision, was preempted by the federal Voting Rights Act (42 U.S.C. §1973aa-6 (2003)) and the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. §12132 (1995)), and that section 19-6 violates equal protection principles.  
Skubisz also contends that the trial court erred in: (1) invalidating nine absentee votes because the absentee ballot certification failed to disclose that those voters received assistance in voting; (2) invalidating certain absentee votes because the voters failed to state a reason for their physical incapacitation on their absentee ballot application form; (3) refusing to admit three misdelivered absentee ballots; and (4) finding that Skubisz's campaign engaged in fraudulent conduct and in deducting, in full, 38 votes from his vote total.  For the reasons set forth below, we affirm.

STATEMENT OF FACTS

This lawsuit arose as a result of a special election held on April 1, 2003, for mayor of Calumet City.  Four candidates ran for office: Skubisz, Qualkinbush, Dominick Gigliotti, and Nick Manousopoulos.  After the ballots had been tallied, the results were: Skubisz, 2,542 votes; Qualkinbush, 2,518 votes; Gigliotti, 718 votes; and Manousopoulos, 1,480 votes.  Skubisz was installed as the mayor on May 1.

On May 2, Qualkinbush filed a verified petition for election contest, alleging voter irregularities, including insufficient reasons being given by physically incapacitated voters on their applications for absentee ballots, improper assistance was given to disabled voters by members of Skubisz's campaign, particularly Michael Kaszak, voters failed to disclose that assistance had been given to them, and illegal delivery or mailing of absentee ballots by Skubisz or members of his campaign.  On June 9, Skubisz filed a verified counterpetition for election contest, also alleging voting irregularities and challenging the validity of section 19-6 of the Election Code.  With respect to the validity of section 19-6, Skubisz also filed a motion to dismiss Qualkinbush's petition.  Subsequent to a hearing on July 2, the trial court concluded that section 19-6 was in compliance with the Voting Rights Act and ADA and it did not violate equal protection principles.  Accordingly, the trial court denied Skubisz's motion to dismiss Qualkinbush's petition on the basis of preemption and equal protection.

On July 8, Qualkinbush filed a motion for partial summary judgment with respect to 51 votes on the basis that the voters failed to provide a sufficient reason or no reason at all for their physical incapacitation on their applications contrary to the mandatory provision of section 19-3 of the Election Code.
(footnote: 2)  This motion was granted in part and denied in part by the court on July 25.  After reviewing each voter separately, the trial court declared 18 votes invalid because the voters failed to provide any reason at all and two additional votes invalid for reasons irrelevant here.  

Qualkinbush also filed a motion for partial summary judgment with respect to 18 voters based on the fact that these individuals, although they had received assistance in voting, failed to disclose that assistance on their certification as required by section 19-5.  On July 30, Skubisz filed a response to this motion.  The same day, the trial court heard arguments on this motion, and granted it in part and denied it in part. 

During the course of the bench trial, which began on August 4, Qualkinbush filed two additional motions for partial summary judgment. First, Qualkinbush moved for partial summary judgment with respect to voters who received assistance, which was not disclosed, and with respect to improper delivery/return of ballots.  The affidavits of 13 voters were attached, identifying the various assistance received from Kaszak, including filling out applications in part or whole, mailing applications, receiving assistance in voting, including punching ballots, and mailing of the ballots.  Thereafter, the trial court granted the motion with respect to improper delivery in connection with eight voters and granted the motion with respect to improper assistance and delivery in connection with four voters.  The trial court also granted the motion for summary judgment with respect to another voter on the basis of receiving assistance that was not disclosed (August 13 order).

Secondly, Qualkinbush filed another motion for partial summary judgment, relating to improper delivery of three ballots.  Attached to this were the affidavits of the three voters.  After hearing testimony from Kaszak in connection with the assistance he rendered to these three voters, the trial court granted the motion. 

At the bench trial, Skubisz was called as an adverse witness by Qualkinbush.
(footnote: 3)  Skubisz admitted that his campaign undertook a concerted effort to procure absentee votes and he believed workers provided absentee ballot applications to "scores" of voters.  Skubisz denied, however, being aware that any assistance was given to voters from his workers, including filling out applications in whole or in part. Skubisz further denied knowing what steps were taken after someone requested an absentee ballot application, but stated it was his secretary's or campaign coordinator's duty to follow up and it was one of Kaszak's duties to provide absentee ballot applications to voters.  

Kaszak confirmed that he procured absentee votes for Skubisz, beginning in 1993, the first time Skubisz ran for mayor.  Kaszak also did so in 2001 and 2003, when Skubisz again ran for mayor.  Kaszak admitted taking absentee ballot applications to voters, helping fill them out, placing applications in envelopes, providing stamps to voters, and mailing applications.  According to Kaszak, all of this was done at the direction of the voters.  Kaszak then left his telephone number on a "receipt" with the voters.  When a voter called, following receipt of his or her ballot, requesting assistance, Kaszak returned to the voter's home.  According to Kaszak, most of the voters were confused because they were elderly and the ballots contained too much "mumbo jumbo" for these "old timers."  Kaszak admitted instructing voters on how to vote, punching ballots for voters, placing ballots in envelopes, filling out certifications, and mailing ballots. 

According to Kim Cornell, Skubisz's campaign secretary, she received numerous telephone calls from individuals requesting absentee ballots.  She wrote their names and telephone numbers on a sticky note and left or gave the notes to those campaign workers, primarily Kaszak, who dealt with absentee ballots.  According to Cornell, she prepared approximately 100 such sticky notes.  Cornell further testified that she received calls from individuals after they had received their absentee ballot, asking what they should do.  Cornell again took the individual's information and gave it to Kaszak or someone else to follow up on.

Gary Rycyzyn, stated that he was the director of elections for the Cook County Clerk's office.  He testified in connection with the chain of custody for ballots from the precincts to the warehouse, the absentee ballot process, and absentee ballot applications. 

On August 25, during a break in the bench trial, Skubisz filed a motion to count three misdelivered absentee ballots.  At a hearing on this motion, it was determined that these votes had turned up the previous Thursday in a precinct not within Calumet City.  Specifically, the ballots had been found in precinct one, Burham, but belonged to precinct three, Calumet City.  The court indicated that witnesses would need to be called with respect to these ballots to establish a chain of custody.  In this regard, Skubisz offered the testimony of Jessica Belmares, the supervisor of the Cook County Clerk's office warehouse, and Ed Bieganik, an election judge for precinct three.  According to Belmares, the envelope in which the ballots had been recently found, while cleaning out the warehouse, stated "precinct one," but the votes were for precinct three.  Belmares did not know what precinct the ballots had been delivered to and only knew that they had been found in an envelope for precinct one.  She also did not know how the ballots got from precinct three to precinct one.  Belmares further testified that a note from the election judges accompanied the envelope, which stated: "Found after final result tape was run and the PBV was turned off.  Please process these absentee ballots."  Belmares stated that she had never seen a note like this before.

Bieganik testified that after the polls had closed on election night and the votes tabulated, the judges found an envelope that appeared to contain absentee ballots.  According to Bieganik, it was the last thing they found that night and, although the envelope was not opened, he believed there were three absentee ballots in it.  Bieganik stated that the judges were at a loss as to what to do with the envelope, so they wrote a note, acknowledging receipt of it.  Bieganik believed that the envelope was placed with the regular ballots and was taken from the polling place to the receiving station in the transfer case.

On cross-examination, Bieganik testified that Yolanda Wilheim had delivered the envelope to the precinct.  When shown the envelope that that been recently found, containing the three ballots, Bieganik stated that it was similar, but was not the same envelope delivered to precinct three because the envelope he was shown at trial had precinct one written on it

Trial resumed and Qualkinbush rested.  Six voters then testified on behalf of Skubisz, stating that they had contacted Skubisz's office for assistance in the absentee voting process and testifying to the assistance they had received.  The assistance they detailed confirmed that testified to by Kaszak. 

Skubisz then testified on his own behalf.  According to Skubisz, absentee votes were important to him because he was running as an independent and needed to do everything possible to win.  As such, Skubisz tried to generate as many people as he could to vote by absentee ballot.  However, he denied being involved in the every day mechanics of the absentee ballot program.  Skubisz knew Kaszak had delivered absentee ballot applications, but did not know how many and never asked.  Skubisz admitted that he had seen sticky notes with respect to absentee ballot applications at the office, but denied seeing any notes in connection with ballots themselves.  Skubisz then rested.

At a subsequent hearing on Skubisz's motion to count the three misdelivered ballots, Skubisz argued that the only logical explanation was that the envelope containing the ballots had been placed in the wrong supply carrier by a deputy clerk.  Qualkinbush argued that there had been no evidence or testimony as to how the ballots got from the Calumet City precinct to the Burnham precinct and, therefore, no chain of custody had been established.  The trial court noted that how the three ballots for precinct three got into precinct one "remain[ed] a mystery."  The court found that someone had made an error and this error could have been an error in security.  Accordingly, the trial court concluded that the ballots had not been sufficiently preserved and would not be counted.

On September 2, the trial court entered its memorandum decision and final judgment order certifying the April 1, 2003, election results.  The court first addressed the credibility of Kaszak's testimony and found that it was not an asset to Skubisz.  The court also noted that, although Skubisz had attempted to distance himself from Kaszak, through not only his own testimony but other witnesses, this attempt lacked sufficient credibility.

The court then dealt with 39 votes (on a list attached to the order) that it had found were voted illegally for reasons previously stated by the court with respect to the various motions for partial summary judgment ruled on prior to trial.
(footnote: 4)  Although the court acknowledged that it did not know who each voter had voted for, it did know that Kaszak assisted each of these voters.  In connection with this assistance, the court was not of the belief that the voters had always asked for assistance as Kaszak had testified.  Rather, the court noted that, after Kaszak filled out the absentee ballot application, he always left a "receipt" with his telephone number.  The court found that this was done to encourage the voter to call him once they received their absentee ballot, to encourage the voter to vote for Skubisz, and so Kaszak could assure that he provided assistance to the voters during the voting process itself.

The court then rendered certain findings with respect to Kaszak's assistance, specifically finding that the evidence demonstrated that, even when Kaszak only provided instruction to a voter, he could nonetheless watch the voter and see for whom he or she had voted.  According to the court, Kaszak should not have placed himself in such a position.  Specifically, the court found that "[t]he intimidation factor [the voter's knowledge that Kaszak was from the Skubisz campaign] would undoubtedly place undue pressure on the voter."  Similarly, with respect to Kaszak's conduct in actually guiding a voter or voting for the voter, the court found that Kaszak's "oversight and presence lead to possibilities for intimidation" and concluded that Kaszak "guided these voters to his candidate either overtly or by his presence."

The court next found that the fact Kaszak filled out the certification for many voters was of significant importance because Kaszak skipped filling out the assistance portion in an overwhelming majority of the ballots upon which he had assisted.  According to the court, "[t]his was no mistake."  Kaszak's action was deliberate and intentional and "[i]t was designed to keep the extent of his assistance unknown and less likely to be detected."  The court believed "that [Kaszak] made every effort to take the ballot from the voter for delivery and [found] this created the opportunity for KASZAK to taint the ballots."

The court then found that the testimony of the absentee voters "provided strong evidence of improper behavior by KASZAK and the SKUBISZ campaign.  The confused testimony by these witnesses demonstrated to the court how easily someone of influence could manipulate their votes."  The court concluded that Skubisz's conduct and his agent's was an "intentional, deliberate, and persistent pursuit of the absentee vote of handicapped voters," "this pursuit was fraudulent and designed to win an election at all costs," that "[t]he campaign targeted the sick, the infirm and the confused," and it was "obvious to the court" that Kaszak "made every effort to examine each and every vote."  The court further concluded that Skubisz was aware of what Kaszak was doing because the practice of picking up absentee ballots was so widespread and Skubisz himself testified that he knew of the absentee voting efforts.  Conversely, the court found that Qualkinbush and her campaign engaged in no wrongdoing during the campaign.

The court then found that Kaszak assisted at least 39 absentee voters and delivered the ballots.  In this regard, the court found that Kaszak "not only had the opportunity to tamper with the ballots while assisting the voter in voting, but also when he assumed custody of the ballot in at least thirty-five separate instances.  It is evident that delivery of these ballots is in violation of section 19-6, but also that the opportunity for tampering existed ***.  Being an unauthorized person to deliver absentee ballots under section 19-6[,] the presumption is that the ballots have been tampered with."  Accordingly, the court held "the 38 votes where illegal delivery by KASZAK was proven or stipulated to and the votes illegally delivered by SKUBISZ shall be subtracted from the SKUBISZ vote total."  As to the remaining absentee ballots, the court concluded that "[t]he illegal scheme *** was completely one-sided" and, "[f]or the sake of equity and fairness, the court will apportion the ballots between all four candidates among the pool of absentee ballots by precinct."

Ultimately, the trial court concluded:

"In summary, the Court finds that the SKUBISZ absentee voter campaign followed deliberate, intentional and aggressive practices to assure the votes of handicapped voters.  The ballots cast by these voters were poisoned by KASZAK to a degree that the fair and equitable remedy is to subtract each and every one of the votes from the SKUBISZ vote total.  The Court finds that it would be inequitable, an injustice, to use Respondent's method of deducting votes."

Following the bench trial and rendering its rulings on the other issues raised by the parties, the court found the final result of the election was 2,530.642 votes for Qualkinbush and 2,504.0523 votes for Skubisz.  Based on these totals, the court declared Qualkinbush to be the winner.

On the same day of the trial court's decision, Skubisz filed a motion to stay enforcement pending appeal, as well as a notice of appeal.  The court granted Skubisz's motion to stay until 5 p.m. on September 3, 2003.  Qualkinbush was installed as mayor after the expiration of this time.

ANALYSIS

Initially, both parties challenge the other parties' brief on appeal.  Qualkinbush contends that Skubisz misstated facts in his statement of facts, gave an incomplete statement of facts, and ignores the fact that the trial court found many of the facts he relies upon incredible.  Skubisz, in his reply brief, asks us to strike Qualkinbush's brief and/or portions thereof because she included an abstract of testimony in her appendix without leave of this court to do so, her statement of facts contains misstatements, arguments, and irrelevant materials that are unsupported by the record, and, in her argument section, she fails to cite to the record, relies on the trial court's opinion as evidence, and instead of making her own arguments, uses the language from the trial court's decision as her arguments.

With respect to Qualkinbush's abstract, Supreme Court Rule 342(b) provides that an abstract of the record shall not be filed unless it is ordered by the court.  Since this court did not order an abstract, this attachment is improper and, therefore, we will disregard it.  See 
Swanson v. Board of Police Commissioners of the Village of Lake in the Hills
, 197 Ill. App. 3d 592, 597, 555 N.E.2d 35 (1990).  

With respect to the parties' statement of facts, without specifically detailing any violations, both parties' statement of facts are deficient and fail to comply with Supreme Court Rule 341(e)(6).  188 Ill. 2d R. 341(e)(6).  Neither states the facts fairly nor accurately without comment.  Accordingly, we will simply disregard those portions that we deem fail to comport with supreme court rules.  
Merrifield v. Illinois State Police Merit Board
, 294 Ill. App. 3d 520, 527, 691 N.E.2d 191 (1998).

I.  Validity of Section 19-6 

A. Voting Rights Act and ADA

Skubisz contends that the trial court erred in denying his motion to dismiss with respect to 34 votes
(footnote: 5) because section 19-6 of the Election Code is preempted by and violates the Voting Rights Act and ADA since it restricts the individuals whom an absentee voter can entrust their ballot with for mailing.  Specifically, Skubisz maintains that section 19-6 impermissibly infringes upon the superior rights set forth by the Voting Rights Act and wrongly denies benefits to and/or discriminates against disabled voters in violation of the ADA. 

   Qualkinbush contends that the trial court's finding that section 19-6 is valid was proper.  According to Qualkinbush, 
McDonald v. Board of Election Commissioners of Chicago
, 394 U.S. 802, 22 L. Ed. 2d 739, 89 S. Ct. 1404 (1969), answers the constitutional questions here and speaks directly to the points raised by Skubisz.
(footnote: 6) 

"It has been established beyond question that there is a fundamental right to vote."  
Griffin v. Roupas
, No. 02 C 5270 (N.D. Ill. September 22, 2003), citing 
Burdick v. Takushi
, 504 U.S. 428, 433, 119 L. Ed. 2d 245, 252, 112 S. Ct. 2059, 2063 (1992).  Despite this principle, however, "there is no corresponding fundamental right to vote by absentee ballot."  
Griffin
, slip op. at ___, citing 
McDonald
, 
394 U.S. at 807, 22 L. Ed. 2d at 745, 89 S. Ct. at 1408.  Specifically, the Supreme Court has held that the right to vote in any manner is not absolute.  
Burdick
, 504 U.S. at 433, 119 L. Ed. 2d at 252-53, 112 S. Ct. at 2063.  Instead, the Court has "recognized that states retain the power to regulate their own elections."  
Burdick
, 504 U.S. at 433, 119 L. Ed. 2d at 253, 112 S. Ct. at 2063.  As the 
Griffin
 court stated,

"[i]t has long been held that the states' powers to determine the conditions under which the right to suffrage may be exercised broadly, so long as they do not do so in a discriminatory manner.  [Citation.]  The courts have held that the Constitution does not prohibit the States from enacting laws which incidentally burden election laws in order to ensure their integrity.  [Citation.]

'Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process.' [Citations.]"  
Griffin
, slip op. at ___.

Section 19-6 of the Election Code provides: 

"***  The voter shall then endorse his certificate upon the back of the envelope and the envelope shall be mailed in person by such voter, postage prepaid, to the election authority issuing the ballot or, if more convenient, it may be delivered in person, by either the voter or by a spouse, parent, child, brother or sister of the voter, or by a company licensed as a motor carrier ***.  It shall be unlawful for any person not the voter, his or her spouse, parent, child, brother, or sister, or a representative of a company engaged in the business of making deliveries to the election authority to take the ballot and ballot envelope of a voter for deposit into the mail unless the ballot has been issued pursuant to application by a physically incapacitated elector under Section 3-3 or a hospitalized voter under Section 19-13, in which case any employee or person under the direction of the facility in which the elector or voter is located may deposit the ballot and ballot envelope into the mail. ***."  10 ILCS 5/19-6 (West 2002).

The return provisions of section 19-6 are mandatory, not directory.  
People v. Deganutti
, 348 Ill. App. 3d 512, 810 N.E.2d 191 (2004).  The purpose of this provision is to " 'safeguard the integrity of the election process by depriving unauthorized persons of the opportunity to tamper with ballots after they have been completed.' [Citation.]" 
Deganutti
, 348 Ill. App. 3d at 519.  The relevant inquiry, however, " 'is not whether a ballot has actually been tampered with, but whether the opportunity for such tampering by unauthorized persons was present.' [Citation.]"  
Deganutti
, 348 Ill. App. 3d at 519. 

Section 1973aa-6 of the Voting Rights Act provides: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union."  42 U.S.C. §1973aa-6 (2003).  Section 12132 of the ADA provides:  "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. §12132 (1995).

Initially, we note that Skubisz cites no authority to establish that the Voting Rights Act is applicable to local elections.  In fact, there is authority to the contrary--the Voting Rights Act is only applicable to federal elections.  
In re Thirteen Ballots Cast in 1985 General Election in Burlington County
, 209 N.J. Super. 286, 289, 507 A.2d 314, 315 (1985); M. Waterstone, 
Constitutional and Statutory Voting Rights for People With Disabilities
, 14 Stan. L. & Policy Rev. 353, 358 (2003).  Moreover, the ADA is merely a broad discrimination statute that does not specifically address voting.  In any event, we will presume these provisions are applicable to the election 
sub judice
.  

"The preemption doctrine provides that in some instances a federal law will override state laws on the same subject."  
Cohen v. McDonald's Corp., 
347 Ill. App. 3d 627, 633, 808 N.E.2d 1 (2004).  This doctrine requires us to examine the federal legislation and determine whether Congress intended it to supplant state laws on the same subject.  
Cohen
, 347 Ill. App. 3d at 633.  Specifically, 

"[f]ederal statutes and regulations can preempt state law in the following circumstances: (1) the language of the statute or regulation expressly preempts state law; (2) Congress implemented a comprehensive regulatory scheme in a given area, removing the entire field from state law; or (3) state law as applied conflicts with federal law."  
Cohen
, 347 Ill. App. 3d at 633.

With respect to these three bases, the following principles are relevant:

"Absent explicit preemptive language, courts may infer Congress's intent to preempt where a federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it or where a federal statute touches a subject or an object in which the federal interest is so dominant that the federal system will be assumed to preclude the enforcement of state laws on the same subject. [Citations.]

Even when Congress has not completely displaced state regulation of a specific subject or object, state law is nullified to the extent that it actually conflicts with federal law. [Citations.]  Actual conflicts arise when it is physically impossible to comply with both federal and state regulations or when state law interferes with the accomplishment and execution of the purposes and objectives of Congress."  
Cohen
, 347 Ill. App. 3d at 633-34.

Preemption is a question of law, which we review 
de novo
.  
Ramette v. AT & T Corp.
, 351 Ill. App. 3d 73, 75, 812 N.E.2d 504 (2004).

Although Skubisz cites general boilerplate preemption law, he does not specify which basis he relies upon here.  However, clearly it is not either of the first two of the three possible preemption bases.  Neither the Voting Rights Act nor the ADA expressly state that they preempt state law on the issue of voting by disabled individuals, let alone absentee voting, particularly, who can assist a disabled voter, and, more particularly, who can return an absentee ballot for a disabled voter.  Moreover, the federal legislation is not so pervasive nor is a federal interest so dominant that preemption would exist under the second basis.  As stated above, it has long been recognized and been the law in the United States that individual states have the right to incidentally burden election laws and regulate elections in their own territories.  See 
Clark v. Quick
, 377 Ill. 424, 427, 36 N.E.2d 563 (1941) ("No one doubts the legislative power to prescribe reasonable conditions [on the right to vote]").  See also 
Curry v. Baker
, 802 F.2d 1302, 1315 (11th Cir. 1986) ("our federal system contemplates that states will be primarily responsible for regulating their own elections"). 

The only basis Skubisz can rely upon is the third one.  Thus, the question before us is whether section 19-6 
actually
 conflicts with the Voting Rights Act or ADA.  Skubisz's arguments do not address this question.  Moreover, Skubisz cites no authority stating that section 19-6 is preempted by either the Voting Rights Act or the ADA because it limits who may deliver an absentee voter's ballot.  Although Skubisz cites 
DiPietrae v. City of Philadelphia
, 666 A.2d 1132 (Pa. Commw. Ct. 1995) in support of his argument that the Voting Rights Act applies to absentee voting, this case does not address Skubisz's position that the federal provisions preempt the limitation on who may return an absentee ballot in section 19-6.  In 
DiPietrae
, the trial court entered an order, directing that

"disabled voters [were] authorized to appoint any person of their choice as their agents to obtain absentee ballot applications, to deliver absentee ballot applications to the Board of Elections, to obtain absentee ballots, and to deliver completed absentee ballots to the Board of Elections in person or by mail with the limitation that an individual 
cannot be the agent for persons living in more than one household
."  (Emphasis added.) 
DiPietrae
, 666 A.2d at 1133.

On appeal, the question was whether the trial court erred in allowing this assistance.  
DiPietrae
, 666 A.2d at 1132-33.  The Pennsylvania statute governing return of absentee votes provided: "Such envelope [containing the completed absentee ballot] shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of electors."  
DiPietrae
, 666 A.2d at 1135.  The disabled voters, in arguing that the trial court did not err in allowing them assistance, contended that the ADA "impose[d] an affirmative duty upon state and local governmental agencies to assure that all persons with disabilities are effectively able to exercise their constitutionally guaranteed rights, none of which is more important than the right to vote."  
DiPietrae
, 666 A.2d at 1135.  The voters further argued that the Voting Rights Act provides that a disabled voter may be given assistance by a person of the voter's choice.  
DiPietrae
, 666 A.2d at 1135.  The 
DiPietrae
 court concluded that "the trial court properly allowed a disabled voter to appoint a person of his or her choice to obtain an absentee ballot application, to deliver it to the Election Board, to obtain an absentee ballot from the Board and to deliver the completed ballot either to the mail box or to the Board."  
DiPietrae
, 666 A.2d at 1135.  However, the court further specifically found that "[t]he trial court's proviso that 'an individual cannot be the agent for persons living in more than one household' appear[ed] to be a reasonable means of balancing the rights of a disabled person who wishes to vote with the public need to insure a fair election."  
DiPietrae
, 666 A.2d at 1135-36.

Skubisz ignores the court's language in 
DiPietrae
 upholding the limitation on who may deliver an absentee voter's ballot, 
i.e.
, someone in a position similar to that of himself and his workers in the instant case since they acted as an agent for more than one household.  Certainly, 
Dipietrae
 recognized the need for assistance in mailing absentee ballots, but also recognized the need to restrict those individuals who may do so to protect the integrity of the election process and found such restrictions permissible under the Voting Rights Act and ADA.  Contrary to Skubisz's argument, 
DiPietrae
 supports a finding that states may limit who can return absentee ballots despite the language of the Voting Rights Act and ADA.

Our independent research has disclosed only one case that has directly addressed the question of whether the Voting Rights Act preempts a state law restricting the individuals who may mail disabled voter's absentee ballots.  In 
In re Thirteen Ballots, 
the question before the court was the validity of 13 absentee ballots  in a local election that had been delivered to the election board with certifications that the voters had been assisted by a candidate in the election in preparing their ballots because of illness or disability.  
In re Thirteen Ballots
, 209 N.J. Super. at 288, 507 A.2d at 315.  The New Jersey statute provided for assistance to an incapacitated absentee voter, but specifically provided that "[i]n no event may a candidate for election provide such assistance, nor may any person, at the time of providing such assistance, campaign or electioneer on behalf of any candidate."  
In re Thirteen Ballots
, 209 N.J. Super. at 288, 507 A.2d at 315.  The court then quoted section 1973aa-6 of the Voting Rights Act and noted that the issue before it was which provision controlled--the state or federal.  
In re Thirteen Ballots
, 209 N.J. Super. at 289, 507 A.2d at 315.  The 
In re Thirteen Ballots
 court concluded that "the New Jersey statute is not affected by the quoted provision of the Voting Rights Act when national candidates are not running for election."  
In re Thirteen Ballots
, 209 N.J. Super. at 289, 507 A.2d at 315.  According to the court, "[t]he clear purpose of the New Jersey statute's prohibition against absentee voter assistance by a candidate is the prevention of fraud.  The prospect of improper influence of voter choices in such circumstances is obvious and underlined by problems previously reported [in other elections in New Jersey]."  
In re Thirteen Ballots
, 209 N.J. Super. at 289, 507 A.2d at 315.  In rejecting the superiority of the Voting Rights Act to the state election at issue, the 
In re Thirteen Ballots
 court stated:

"The federal statute ignores the possibilities of fraud in its provisions permitting assistance to absentee voters.  It is not our role to debate its wisdom.  We are, however, obliged to recognize its limitations.  The Voting Rights Act and amendments thereto provided Congress with authority to control national elections and, to a limited extent, state elections.  Its control of the latter is confined to the enactment of legislation enforcing provisions of the United States Constitution, notably, in the present case, its Thirteenth, Fourteenth, Fifteenth, Nineteenth and Twenty-fourth Amendments.  The majority of the United States Supreme Court so held in 
Oregon v. Mitchell
, 400 U.S. 112, 91 S.Ct. 260, 27 L. Ed.2d 272 (1970), in which, among other things, it upheld the provisions of the act lowering the voting age to 18 in national elections, but struck down the extension of those provisions to state and local elections."  
In re Thirteen Ballots
, 209 N.J. Super. at 289, 507 A.2d at 315.

Thereafter, the court concluded that the "prohibition against candidate assistance to absentee voters is not discriminatory [and i]t is a reasonable regulation of our voting machinery, properly designed to prevent fraud."  
In re Thirteen Ballots
, 209 N.J. Super. at 289, 507 A.2d at 316.  See also 
Gramlich v. Cottrell
, 204 N.J. Super. 490, 492-94, 499 A.2d 275, 275-77 (1985) (finding 18 absentee ballot votes invalid because a candidate or an agent of the candidate improperly provided assistance to 18 residents of a nursing home, noting that the no-candidate assistance provision was included because the legislature had "a clear desire to increase [the] government's ability to guarantee the integrity of absentee voting procedures [and o]f particular concern were those isolated from the rest of the community due to illness or infirmity"); 
Gooch v. Hendrix
, 5 Cal. 4th 266, 279-80, 851 P.2d 1321, 1329, 19 Cal. Rptr. 2d 712, 720 (1993) (holding that absentee ballots collected from disabled voters by a political association and returned in person or mailed by members of this association were void since such conduct violated the California statute providing that only a "spouse, child, parent, grandparent, grandchild, brother, or sister" could return such ballot).

These cases, although not binding on us, are persuasive and support a conclusion that, even in light of the federal provisions, states may impose restrictions on those individuals who may return a disabled voter's absentee ballot, and that such restrictions may be above and beyond those set forth in the Voting Rights Act.  See also 3 McQuillin Municipal Corporations §12.16, at 163 (3d ed. 2001) (stating that state statutes may proscribe assistance by only certain persons and, if the state statute is more restrictive than the Voting Rights Act, then it applies only to local elections).

Skubisz also relies on the Senate Judiciary Committee comments to the 1982 amendments to the Voting Rights Act.  However, when read in context, the legislative concerns clearly related to in-booth voting as established by the very language of the comments.  Specifically, the comments included phrases such as: "within the voting booth," "discriminated against at the polls," "permit them [the disabled voters] to bring into the voting booth a person whom the voter trusts and who cannot intimidate him," and " 'pull the lever of a voting machine.' "  S. Rep. 97-417, 1982 U.S.C.C.A.N. 177, 240 (May 25, 23, 1982).  There is nothing in these comments relating specifically, or inferentially, to absentee ballot voting, and, more specifically, to the return of absentee ballots.

Moreover, and quite importantly, Skubisz ignores the clear basis set forth by the legislature for allowing a voter to choose who will assist him or her--the potential for undue influence and manipulation.  In this respect, the committee stated that "because of their need for assistance, members of these groups are more susceptible than the ordinary voter to having their vote unduly influenced or manipulated."  S. Rep. 97-417, 1982 U.S.C.C.A.N. at 240.  In further discussing its concerns, a member of the committee stated: "The committee is concerned that some people in this situation do in fact elect to forfeit their right to vote.  Others may have their actual preference overborne by the influence of those assisting them or be misled into voting for someone other than the candidate of their choice."  S. Rep. 97-417, 1982 U.S.C.C.A.N. at 240-41.  As such, the committee concluded that the only way "to avoid possible intimidation or manipulation of the voter" was to allow the voter to choose whom they desire to assist them."  S. Rep. 97-417, 1982 U.S.C.C.A.N. at 241.

Lastly, Skubisz ignores the plain language used by the committee with respect to preemption.  Specifically, a member of the committee stated: 

"The committee recognizes the legitimate right of any state to establish necessary election procedures, subject to the overriding principle that such procedures shall be designed to 
protect the rights of voters
.  State provisions would be preempted only to the extent that they 
unduly burden
 the right recognized in this section, with that determination being a practical one dependent upon the facts."  (Emphasis added.)  S. Rep. 97-417, 1982 U.S.C.C.A.N. at 241.

Clearly, the core concern in allowing assistance of a person of the voter's choice was the integrity of the vote.  This, too, is the general purpose of election laws.  It is evident that the integrity of a vote is even more susceptible to influence and manipulation when done by absentee ballot.  See, 
e.g.
, 
State ex rel. Whitley v. Rinehart
, 140 Fla. 645, 651, 192 So. 819, 823 (1939) (the "purity of the ballot is more difficult to preserve when voting absent than when voting in person").  This is precisely what section 19-6 protects against--it prevents a candidate or his or her agent from asserting undue influence upon a disabled voter and from manipulating that voter into voting for the candidate or the agent's candidate.  It is designed to protect the rights of disabled voters.  Certainly, then, section 19-6 of the Election Code does not conflict with the intent and purpose of the Voting Rights Act or ADA.  Moreover, engaging in a practical determination, as the federal legislature itself said was applicable, we do not find that the restriction on who may return an absentee ballot for a disabled voter under section 19-6 unduly burdens that individual's right to vote and, thus, is not preempted by the Voting Rights Act.  Skubisz has not established that the federal legislature intended to preempt the rights of state legislatures to restrict absentee voting, and, particularly, who may return absentee ballots.  Such a finding is simply not supported by the language of the federal provisions, the history and comments thereto, or the clear intent of Congress.  Accordingly, we find that the trial court did not err in denying Skubisz's motion to dismiss on the basis that section 19-6 of the Election Code was preempted by the Voting Rights Act or ADA and did not err in invalidating the 38 votes.

B. Equal Protection

Skubisz next contends that section 19-6 is unconstitutional because it violates equal protection principles, maintaining that we must apply the strict scrutiny test since the right to vote is a fundamental right.  Skubisz argues that the restriction as to who can assist absentee voters is not the least restrictive means of attaining the goal of the statute.  Skubisz further maintains that the Illinois statute allows similarly situated incapacitated voters, those hospitalized (section 19-13 of the Election Code), to pick any person of their choice to mail their ballots.

Qualkinbush contends that section 19-6 does not violate equal protection.  Qualkinbush maintains that the right to vote is not at issue and, therefore, the strict scrutiny test does not apply.  Qualkinbush also argues that the hospital voter provision is very specific and narrow in its application and far more restrictive and burdensome than section 19-6 and, therefore, is not comparable.

Initially, as stated above, the right to vote is a fundamental right, but the right to vote by absentee ballot is not a fundamental right.  As such, Skubisz's argument that the strict scrutiny test applies is erroneous.  
Griffin
, slip op. at ___.  Moreover, with respect to the right to vote, the Supreme Court has recently endorsed a "flexible standard" in addressing constitutional challenges to voting laws.  
Burdick
, 504 U.S. at 434, 119 L. Ed. 2d at 253, 112 S. Ct. at 2063.  Specifically, in 
Burdick
, the Court held:

"A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.' [Citation.]"  
Burdick
, 504 U.S. at 434, 119 L. Ed. 2d at 253, 112 S. Ct. at 2063.

In other words,

"[t]he rigorousness of a court's scrutiny depends upon the extent to which a challenged regulation burdens Fourteenth Amendment rights.  [Citation.]  Thus, when such rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' [Citation.]  However, when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions.  [Citation.]"  
Griffin
, slip op. at ___.

As noted above, Qualkinbush maintains that 
McDonald
 answers all of the constitutional questions raised here.  Conversely, Skubisz maintains that 
Goosby v. Osser
, 409 U.S. 512, 35 L. Ed. 2d 36, 93 S. Ct. 854 (1973), overrides 
McDonald
.  We need not address either case in detail since they are not directly on point and do not address the precise issue raised in the instant case.  The Court in 
McDonald
 concluded that the Illinois Election Code, which denied the petitioners who were pretrial detainees the ability to receive an absentee ballot, did not deny them equal protection, finding that it was not the right to vote at stake, "but a claimed right to receive absentee ballots."  
McDonald
, 394 U.S. at 807, 22 L. Ed. 2d at 745, 89 S. Ct. at 1408.  Specifically, the Court concluded that neither the absentee ballot provisions nor the Election Code, as a whole, operated to deny or preclude pretrial detainees the ability to vote at all.  
McDonald
, 394 U.S. at 807-08, 22 L. Ed. 2d at 745, 89 S. Ct. at 1408.  As such, the absentee ballot provision did not deny the petitioners equal protection of law.  In 
Goosby
, the Pennsylvania petitioners again were pretrial detainees and made a similar claim as that made in 
McDonald
.  The 
Goosby
 Court, however, distinguished 
McDonald
 and found that its holding was not controlling because the Pennsylvania election scheme, unlike the Illinois scheme, absolutely prohibited the petitioners from voting.  
Goosby
, 409 U.S. at 521, 35 L. Ed. 2d at 44, 93 S. Ct. at 860.  As such, the 
Goosby
 Court found there was a "significant difference" between the two schemes.  
Goosby
, 409 U.S. at 522, 35 L. Ed. 2d at 44, 93 S. Ct. at 861.  The 
Goosby
 Court did not decide the merits of the petitioners' equal protection claim and specifically stated it was making no judgment on the merits.  
Goosby
, 409 U.S. at 522, 35 L. Ed. 2d at 44, 93 S. Ct. at 861.  Clearly, contrary to Skubisz's argument, 
Goosby
 does not overrule or "override" the holding of 
McDonald
.  In any event, as stated above, neither case addresses the question before this court and, therefore, neither is controlling.

We find that the burden placed upon absentee voters by the restriction on who may mail an absentee ballot in section 19-6 is slight and is nondiscriminatory.  This provision limits the number of third parties who come in contact with an absentee ballot and provides a safeguard that the ballot will be voted based on the intent of the voter, not someone else.  Additionally, this provision limits the number of third parties who come in contact with the absentee ballot once it has been voted, thus limiting the number of individuals able to tamper with it, destroy it, or fail to mail it.  As stated above, the legislative purpose of section 19-6 is to safeguard the integrity of the election process.  This is an important state interest.  Certainly, the restriction in section 19-6 furthers this goal and justifies the restriction.  "The general purposes of election laws are to obtain fair and honest elections and to obtain a correct expression of the intent of the voters."  
Courtney v. County Officers Electoral Board
, 314 Ill. App. 3d 870, 872-73, 732 N.E.2d 1193 (2000).  We believe the restriction imposed by section 19-6 substantially contributes to the integrity of the election process.  This restriction is a reasonable means of eliminating opportunities for election fraud and uncertainty, and the important state interest in the integrity of the election process demands that provisions such as this, that contribute substantially to the integrity of the election process, be enforced by the courts.  See also 
Deganutti
, 348 Ill. App. 3d at 520-21 (holding that section 29-20(4) of the Election Code, which provides that an individual who "takes an absentee ballot of another person in violation of Section 19-6 so that an opportunity for fraudulent marking or tampering is created," is guilty of a Class 3 felony, was "rationally related to the legitimate state goal of protecting and preserving the integrity of the election process"; specifically, "[s]ection 29-20(4) of the Code, *** protects the integrity of the election process by depriving unauthorized persons of the opportunity to tamper with completed absentee ballots, thereby addressing such issues as coercion, fraud, and secrecy that potentially arise with absentee voting").

With respect to Skubisz's claim that equal protection principles are violated because similarly situated absentee voters, those under section 19-13 of the Election Code, are treated differently, 
i.e.
, those voters are allowed to choose any person to mail their absentee ballots, we disagree.  Section 19-13 relates to individuals who have been admitted to a hospital not more than five days before an election and allows for personal delivery of an absentee ballot to that person upon application and certification from that individual's attending physician.  With respect to return of the absentee ballot, section 19-13 provides:

"Upon receipt of the absentee ballot, the hospitalized voter shall mark the ballot in secret *** [and] such voter shall give the envelope to the precinct voter [any person who is registered to vote in the same precinct as the hospitalized voter] or the relative who shall deliver it to the election authority in sufficient time ***."  10 ILCS 5/19-13 (West 2002).  

We first observe that there is nothing in this provision with respect to mailing the absentee ballot.  Rather, section 19-13 speaks of delivering the ballot.  Given the time frame, it is doubtful whether such absentee ballots could be mailed.  In any event, the individuals in section 19-13 are not similarly situated to the general incapacitated voters.  Most notably, these individuals would not have previously requested an absentee ballot and only do so because of a sudden and unusual situation, within five days of the election.  The concerns with respect to targeting a certain infirm group and exerting influence and manipulation over these hospitalized individuals is not an issue since no one could foresee their situation and the fact they would have to vote by absentee ballot.  This is certainly a very narrow class of individuals where the opportunity for fraud in connection with their voting is not as strong as with an incapacitated individual targeted by a candidate months before an election.  Accordingly, we find that the trial court properly concluded that section 19-6 of the Election Code did not violate equal protection principles.

In summary, we find that the trial court did not err in denying Skubisz's motion to dismiss on the basis that section 19-6 of the Election Code was invalid or unconstitutional.

II.  Section 19-5 Challenge

Skubisz next contends that the trial court erred in invalidating and deducting from his vote total, on summary judgment, nine votes under section 19-5 of the Election Code on the basis that Kaszak was not identified as having given assistance to the voters where the assistance only involved the giving of instructions.

Skubisz fails to identify which nine votes are at issue, or to which summary judgment ruling he is referring.  On July 30, 2003, the trial court granted summary judgment in favor of Qualkinbush on the basis of the lack of disclosure.  This ruling involved 18 votes of which Kaszak admitted to punching the ballots of 15 voters.  On August 13, the trial court granted summary judgment in favor of Qualkinbush with respect to another voter on the basis of lack of disclosure.  The extent of Kaszak's assistance to this voter is not apparent from the record.  In any event, this would leave only four potential votes where Kaszak's assistance did not include punching the ballot.  Where Skubisz obtains the other five votes is not evident.

"A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented ***, and it is not a repository into which an appellant may foist the burden of argument and research."  
Obert v. Saville
, 253 Ill. App. 3d 677, 682, 624 N.E.2d 928 (1993).  "[I]t is neither the function nor the obligation of this court to act as advocate or search the record for error."  
Obert
, 253 Ill. App. 3d at 682.  Based upon Skubisz's failure to identify which nine votes he is challenging or to specify the ruling he is appealing from, we decline to address the merits of this challenge.

III.  Section 19-3 Challenge

Skubisz next contends that the trial court erred in striking 6.16 votes for him based on noncompliance with section 19-3 of the Election Code, 
i.e.
, the voters failed to sufficiently state the reason for their incapacitation, because the form used by the voting authority failed to substantially comply with the statutory form since it added language and provided two different boxes for physical incapacitation.  According to Skubisz, because the deficiencies were due to election authority error, not voter error, the votes cannot be invalidated.  Skubisz further maintains that the voters simply failed to provide a "subreason" for their disability, which is not a requirement under the statute.

Qualkinbush contends that the trial court properly invalidated these votes because no reason at all was given for the incapacitation, which is mandatory under the Election Code.  Additionally, Qualkinbush argues that the form used by the election authority was in substantial compliance with the statutory form.

Skubisz has not specifically identified the votes he challenges, nor how he arrived at the figures he has set forth. Skubisz does, however, refer to the trial court's July 25, 2003, order in connection with Qualkinbush's motion for partial summary judgment on the basis that insufficient reasons were provided on the applications.  In her motion, Qualkinbush challenged 51 applications.  The trial court held 18 invalid because the applicant failed to provide any reason at all.  We will presume it is these 18 votes Skubisz is challenging, as subsequently apportioned by the trial court. 

Under section 19-3, sample statutory forms are set forth based on the different reasons for absentee voting.  Most of the samples are reason-specific forms, 
i.e.
, when the applicant expresses a specific reason for being absent from the polling place.  One of the reason-specific forms is entitled "APPLICATION FOR BALLOT BY PHYSICALLY INCAPACITATED ELECTOR."  On this form, the applicant must complete the following sentence, "I shall be physically incapable of being present at the polls *** for the following reasons," which is followed by a blank space.  10 ILCS 5/19-3 (West 2002).  Section 19-3 also sets out a sample form entitled "APPLICATION FOR ABSENT VOTER'S BALLOT."  This form is nonreason-specific and instructs the applicant to "Check One" of the "following reasons."  Nine different reasons are then set forth.  One of the choices is, "I am physically incapacitated," followed, on the next line, by the word "Reason(s)" and a blank space.  Numerous other choices also include additional blanks that are required to be filled in with respect to that particular choice for voting by absentee ballot.  The form at issue in the instant case is akin to the latter form, although the form here contains 11 different choices.  After stating, "Check One," but before setting forth the different choices, the form here also includes the following language: "
(YOU WILL BE REQUIRED TO COMPLETE ANOTHER APPLICATION FOR ABSENTEE BALLOT IF YOU FAIL TO SPECIFY A REASON.)
"  Additionally, the form sets forth two different "physically incapacitated" choices.  The first states, "I am temporarily physically incapacitated.  Reason," followed by a blank space.  The second states, "I am permanently physically incapacitated.  Reason or Disabled Voter I.D.#," followed by a blank space.

We disagree with Skubisz that the application at issue here does not substantially comply with the statutory form.  The addition of the language typed in bold above does not render the form confusing nor out of compliance with the statutory form.  This language merely reinforces the statement above it that a reason must be checked and any additional information necessary to that reason filled in.  Further, we do not find that the fact the form identifies two choices for physical incapacitation conflicts with the statutory form or renders the application confusing.  The Election Code addresses permanently disabled individuals and the Illinois Disabled Voters Identification Card in various sections, including sections 17-14, 19-12.1, and 19-12.2.  10 ILCS 5/17-14,  19-12.1, 19-12.2 (West 2002).  Section 19-12.1 provides, with respect to the absentee ballot application based on permanent disability, that "[s]uch application shall contain the same information as is included in the form of application for ballot by a physically incapacitated elector prescribed in Section 19-3 except that it shall also include the applicant's disabled voter's identification card number."  10 ILCS 5/19-12.1 (West 2002).  The election authority in the instant case merely included both types of incapacitation on the nonreason specific form, which is actually in compliance with the Election Code, rather than in conflict with it, since permanent physical incapacitation is another choice/reason under the Election Code for voting by absentee ballot.  Accordingly, we find that the form at issue here is in substantial compliance with the Election Code and, particularly, section 19-3.

We further disagree with Skubisz that the voters simply failed to provide a subreason for their disability which, according to him, is not required by section 19-3.  Whether denoted a subreason or reason, the absentee ballot applicants must identify why they are physically incapacitated.  Not only does section 19-3 specifically require this, but case law interpreting section 19-3 holds that such identification is mandatory.  

As set forth above, the nonreason-specific statutory form states, "I will be unable to vote in person at the polls of such precinct for the following 
reasons
: (Check one)."  (Emphasis added).  10 ILCS 5/19-3 (West 2002).  Thereafter, the form identifies various specific choices, one being, "I am physically incapacitated.  
Reason(s),
" followed by a blank space for stating the basis for the physical incapacitation, or, if we use Skubisz's term, a subreason.  Clearly, the statutory form requires a voter to give two reasons: physical incapacitation and then the reason for their incapacitation be it back, leg, stroke, 
etc.

Moreover, case law has specifically held that a physically incapacitated voter must identify why he or she is incapacitated.  In 
People ex rel. Ciaccio v. Martin
, 220 Ill. App. 3d 89, 580 N.E.2d 930 (1991), relied upon by Qualkinbush, the sole question before the court was "whether the trial court erred in finding mandatory the requirement that a voter applying for an absentee ballot based on physical incapacity state the reason for that incapacity."  
Ciaccio
, 220 Ill. App. 3d at 90.  In 
Ciaccio
, although 25 absentee ballot applicants failed to state a reason for their physical incapacity as the application required, the county clerk apparently ignored that failure and issued ballots nonetheless.  
Ciaccio
, 220 Ill. App. 3d at 91.  The petitioner argued that the court should not disenfranchise the voters since they were not at fault.  
Ciaccio
, 220 Ill. App. 3d at 91.  The 
Ciaccio
 court disagreed, concluding that the language of section 19-3 was "mandatory and the ballots should not have been issued based on the incomplete applications."  
Ciaccio
, 220 Ill. App. 3d at 91.  In this regard, the court stated that the "legislature intended that the procedures for obtaining and using an absentee ballot be scrupulously followed" to "enhance the integrity of the electoral process."  
Ciaccio
, 220 Ill. App. 3d at 91.  Accordingly, the 
Ciaccio
 court concluded that the trial court properly deducted the ballots from the electoral count.  
Ciaccio
, 220 Ill. App. 3d at 92.

In 
In re Purported Election of Bill Durkin
, 299 Ill. App. 3d 192, 700 N.E.2d 1089 (1998), relied upon by both parties, the petitioner challenged 185 absentee ballots because the voters failed to state on their applications the reason for their incapacity.  
Durkin
, 299 Ill. App. 3d at 194.  In addressing the issue, the 
Durkin
 court noted that one case had previously directly addressed the issue, citing 
Ciaccio
.  Although the 
Durkin
 court agreed with the 
Ciaccio
 court's determination "that the requirement that a voter applying for an absentee ballot on the basis of physical incapacity must specify the reason for the physical incapacity on the application form is a mandatory requirement under the Election Code," the 
Durkin
 court nonetheless concluded that the circumstances present in 
Ciaccio
 were distinguishable from those in the case before it.  
Durkin
, 299 Ill. App. 3d at 197.  Specifically, the appellate court agreed with the trial court's finding that, "unlike the absentee ballot applications used in 
Ciaccio
, the absentee ballot applications used in [
Durkin
] did not indicate that the applicants should specify the reason for their physical incapacity."  
Durkin
, 299 Ill. App. 3d at 197.  In this regard, the 
Durkin
 court found that the "the voters who completed the forms did nothing wrong in completing the incorrectly prepared forms," and, thus, their votes should not be disenfranchised.  
Durkin
, 299 Ill. App. 3d at 197-98.  In addition, the 
Durkin
 court agreed with the trial court's finding that 
Ciaccio
 was distinguishable because in 
Ciaccio
 there were allegations of voter fraud, whereas in 
Durkin
 there were no such allegations.  
Durkin
, 299 Ill. App. 3d at 198.  In this regard, the 
Durkin
 court stated as follows: "We also note that the trial court stated that its research revealed that in 
Ciaccio
 the same person had written 24 of the 25 challenged absentee ballot applications in that case." 
Durkin
, 299 Ill. App. 3d at 198.  Ultimately, the 
Durkin
 court concluded that the "mandatory requirements [of section 19-3] are overcome by the equitable principle of disenfranchisement avoidance" in the case before it.  
Durkin
, 299 Ill. App. 3d at 198.  Clearly, these cases support a conclusion that an absentee ballot applicant must include or identify a reason for his or her physical incapacitation and the failure to do so will generally result in the vote being invalidated.

Lastly, with respect to Skubisz's argument that the election authority was at fault, not the voters, we do not agree.  First, as discussed above, the application form was not deficient or improper.  More importantly, the above cases stand for the proposition that if a space has been provided to identify a reason for one's physical incapacitation, and the voter fails to fill that space in, his or her vote is invalid.  
Ciaccio,
 220 Ill. App. 3d at 91.  But see 
Durkin
, 299 Ill. App. 3d at 197-98 (no space for reason provided).  Additionally, we note that the case 
sub judice
 is akin to 
Ciaccio
 with respect to the fraud element.  As in 
Ciaccio
, the evidence presented here demonstrates that, of the 18 votes held invalid, Kaszak himself had filled in the reason for the voter on 11 of the applications.  Whether he did so for the other seven applications is not apparent from the record.  Thus, clearly the election authority was not at fault.

Accordingly, we find that the trial court did not err in invalidating absentee votes based on the fact the voters failed to specify a reason for their physical incapacitation on their absentee ballot applications.

IV.  Admission of Three Misdelivered Votes

Skubisz next contends that the trial court abused its discretion in refusing to admit and count three absentee votes because they were found in the possession of a different precinct.  According to Skubisz, the trial court erred in finding that these votes lacked a chain of custody.  Skubisz argues that the votes were always in the custody of the election authorities, in their proper form, just in the wrong envelope, and there was no evidence of tampering.  Qualkinbush contends that the trial court did not abuse its discretion in refusing to admit these ballots because there was no chain of custody shown for the large envelope in which they were found. 

In order for ballots to be admissible, an adequate foundation must be laid, establishing that they are the same items as found on election night and that their condition has not substantially changed.  
Van Hattem v. Kmart Corp.
, 308 Ill. App. 3d 121, 134, 719 N.E.2d 212 (1999).  A proper foundation may be laid "either through identification of the object by a witness or through the establishment of a chain of custody."  
Van Hattem
, 308 Ill. App. 3d at 134.  The chain of custody "must be of sufficient completeness to render it improbable that the object has either been exchanged with another or subjected to contamination or tampering."  
Van Hattem
, 308 Ill. App. 3d at 134-35.  The burden rests upon the proponent of the evidence to prove that the ballots have been kept intact.  
MacWherter v. Turner
, 52 Ill. App. 2d 270, 273, 201 N.E.2d 325 (1964).  It is not necessary that an unlawful interference with the ballots be shown.  
Talbott v. Thompson
, 350 Ill. 86, 93, 182 N.E. 784 (1932).  Rather, it is sufficient to invalidate the ballots as evidence if "the opportunity for interference of unauthorized persons existed."  
Talbott
, 350 Ill. at 93; 
MacWherter
, 52 Ill. App. 2d at 273.  "If, however, the ballots are produced in court, and it clearly appears that they are in the same condition as when counted by the judges of election," they are admissible into evidence.  
Talbott
, 350 Ill. at 93.  The question of proper preservation and chain of custody is a factual one based on the circumstances of each case.  
Patterson v. Johnston
, 328 Ill. 101, 104, 159 N.E. 211 (1927); 
MacWherter
, 52 Ill. App. 2d at 274.  The trial court's decision with respect to the admissibility of evidence lies within its discretion and we will not disturb that decision absent an abuse of discretion.  
Van Hattem
, 308 Ill. App. 3d at 135.

Here, Skubisz was required to demonstrate a sufficient chain of custody because there was no evidence establishing that the three ballots discovered late on election night as the same ballots discovered in the warehouse.  We find that Skubisz failed to demonstrate a sufficient chain of custody.  Again, these ballots had been discovered in materials from a precinct not within Calumet City, on or about August 21, during the course of trial, some four months after the election, when the clerk's office was cleaning out its warehouse.  The ballots belonged to precinct three, but were within precinct one materials, and were found within a larger envelope.  A note from the election judges from precinct three was found within the envelope discovered on August 21.  Although Belmares, the warehouse supervisor, had no knowledge as to what precinct the ballots found on August 21 had been delivered to, Bieganik, a precinct three election judge, testified that Wilheim had delivered an envelope to precinct three, presumably containing three absentee ballots.  There was no direct evidence, however, as to what was contained in the envelope delivered to precinct three on election day.  Although Bieganik testified that he believed it was three absentee ballots from some indication on the envelope, he was not positive because the judges never opened the envelope.  In addition, Bieganik testified that the envelope delivered to precinct three on election day was not the same envelope discovered on August 21 and shown to him in court.

Based on the facts of this case, there was no evidence that the ballots discovered on August 21 remained unchanged or were, in fact, the same ballots delivered to precinct three on election night.  To the contrary, the evidence was clear that the envelope, at the least, found in the warehouse was not the same envelope delivered to precinct three.  There was no evidence identifying for a fact what was contained in the envelope discovered in precinct three.  As such, Skubisz could not show there was no opportunity for interference and could not establish a sufficient chain of custody.  Accordingly, we find that the trial court did not abuse its discretion in denying admission of these three votes.  Even if the trial court erred in denying admission of these votes, we would deem the error harmless because it would not change the result of the trial court's final determination, 
i.e.
, the three votes would not tip the scale in favor of Skubisz and render him the winner of the election.

V.  Propriety of Fraud Finding & Vote Reduction

Skubisz lastly contends that the trial court erred in finding that he committed fraud and in imposing a full vote reduction (of 38 votes), rather than proportional deduction.  Skubisz maintains that the trial court erred in judging credibility and in not believing Kaszak's testimony in certain respects where it was uncontradicted.  Skubisz also maintains that the trial court had no right to disregard Rycyzn's testimony on matters involving voting secrecy and levels of assistance.  Skubisz argues that the Election Code was not violated, as argued above, and/or certain provisions are invalid, and there is nothing in the law that says a candidate cannot seek votes.  Accordingly, Skubisz contends that the trial court's findings were erroneous.  Skubisz also argues that it was erroneous for the court to impose a full-vote reduction where proportional reduction was the proper remedy.  

"In an election contest the finding of the trial court[,] which observed the demeanor of the witnesses while testifying, will not be disturbed on appeal unless it is palpably against the manifest weight of the evidence."  
Dirst v. McDonald
, 372 Ill. 498, 502, 24 N.E.2d 361 (1939).  See 
Park v. Hood
, 374 Ill. 36, 45, 27 N.E.2d 838 (1940); 
City of Rolling Meadows v. National Advertising Co.
, 228 Ill. App. 3d 737, 747, 593 N.E.2d 551 (1991) (the trial court's decision following a bench trial will not be disturbed unless it is against the manifest weight of the evidence).  A determination is against the manifest weight of the evidence "where, upon reviewing the evidence in the light most favorable to the prevailing party, the opposite conclusion is clearly apparent or the finding is palpably erroneous or arbitrary and unsubstantiated by the evidence."  
Chicago Transparent Products, Inc. v. American National & Trust Co. of Chicago
, 337 Ill. App. 3d 931, 940, 788 N.E.2d 23 (2002).  In other words, a decision is against the manifest weight of the evidence where the facts demonstrate that the trial court should have reached the opposite conclusion.  
In re D.D.
, 196 Ill. 2d 405, 417, 752 N.E.2d 1112 (2001).  

We initially note, with respect to Skubisz's argument that the trial court erred in judging credibility and disbelieving portions of Kaszak's testimony, that this is the trial court's function in a bench trial.  
Dwyer v. Love
, 346 Ill. App. 3d 734, 737, 805 N.E.2d 719 (2004) (the trial court is the trier of fact in a bench trial).  Accordingly, Skubisz's "argument" is simply absurd.  The same is true with respect to his argument in connection with Rycyzyn's testimony, particularly as to what assistance is required to be disclosed.  This is a legal question, not for Rycyzyn's determination, but rather for the trial court.

Substantively, we find that the trial court's decision was not against the manifest weight of the evidence.  Specifically, there was overwhelming evidence that Skubisz and his workers engaged in extensive conduct in violation of valid provisions of the Election Code.  As the trial court found, it is evident that Skubisz's campaign targeted elderly individuals in an effort to persuade or influence them into voting for Skubisz.  Whether or not it is proper to solicit votes, the manner in which Skubisz's campaign did so was clearly improper.  Kaszak not only punched the ballots for voters, but was in near proximity to other individuals as they voted, enabling him to see how they cast their ballots and rendering their ability to vote in secret null.  Kaszak then mailed most of the ballots in violation of the Election Code.  There can be no question, as the trial court found, that Skubisz and his workers' conduct was intentional and deliberate.  Based on the evidence presented, we find that the trial court's decision was not palpably erroneous, arbitrary, or unsubstantiated by the evidence.  No rational person could say, on the evidence presented here, that the trial court should have reached an opposite conclusion as to the illegality of these 38 votes.  Accordingly, we affirm the trial court's decision.

With respect to fraudulent votes, the Illinois Supreme Court has stated:   "The rule obtains in elections, as in other affairs, that a man shall not profit by his own wrong, nor by that of others done to allow him to reap the benefit.  The only means by which approximate justice may be reached when the illegal acts render the result doubtful is to require the party to whose benefit they inure to purge the poll of their effect, or to suffer the penalty of having its majority excluded from his count of votes.  (Citation).  When the ballot box becomes the receptacle of fraudulent votes, the freedom and equality of elections are destroyed."  
Lehman v. Hill
, 414 Ill. 173, 178, 111 N.E.2d 120 (1953).

Whether a vote should be apportioned or excluded depends on the circumstances present in the case.  
Hileman v. McGinness
, 316 Ill. App. 3d 868, 870, 739 N.E.2d 81 (2000).  Where fraud is involved, exclusion is the procedure of choice.  
Hileman
, 316 Ill. App. 3d at 870.  In this regard, when the number of illegal votes cannot be ascertained, an entire poll or absentee ballots may be rejected.  
Leach v. Johnson
, 20 Ill. App. 3d 713, 718, 313 N.E.2d 636 (1974).  See also 
Lehman, 
414 Ill. at 178-79 (rejecting an entire poll because fraud permeated the election and the illegal votes could not be segregated).  Conversely, when the number of illegal votes can be ascertained, the entire poll need not be rejected.  
Frese v. Camferdam
, 76 Ill. App. 3d 68, 76, 394 N.E.2d 845 (1979).  Where fraud is not involved, but it cannot be ascertained for which candidate a ballot was cast, the remedy is apportionment.  
Hileman
, 316 Ill. App. 3d at 870.  See, 
e.g.
, 
Hileman
, 316 Ill. App. 3d at 871 (holding that apportionment of illegal absentee ballots would be proper if no evidence of fraud were found upon remand); 
Webb v. Benton Consolidated High School District No. 103 in Franklin County
, 130 Ill. App. 2d 824, 826, 264 N.E.2d 415 (1970) (holding that it was proper to apportion illegal votes where there was no evidence of fraud; particularly, there was no evidence any absentee voter had been influenced or coerced by any election official).

Both parties here rely upon 
Frese
.  
Skubisz maintains this case supports apportionment and Qualkinbush maintains it supports deduction of the 38 illegal votes from Skubisz's total.  In 
Frese
, 39 absentee ballots were invalidated on the basis of improper delivery and return.  
Frese
, 76 Ill. App. 3d at 73.  However, the court specifically noted that there had been no evidence of fraud in connection with these ballots.  
Frese
, 76 Ill. App. 3d at 73.  The 
Frese
 court then affirmed the trial court's apportionment of these votes between the candidates because the number of invalid votes could be ascertained, but it could not be determined who the votes were cast for and, as such, apportionment was the proper remedy.  
Frese
, 76 Ill. App. 3d at 76.   

Frese
 does not support apportionment here, as urged by Skubisz, for the simple reason that 
Frese
 did not involve fraudulent conduct being the basis for declaring the votes invalid as the instant case does.  The case 
sub judice
 clearly falls under the rules of exclusion.  The 38 votes were declared invalid because of Skubisz or his workers' fraudulent conduct.  Although the trial court acknowledged that "[s]ome may argue that we cannot determine with any degree of accuracy who the voters voted for in the election," we agree with the court that this proposition is "naïve" based on the fact Kaszak punched the votes for so many people and oversaw the remainder of the voters.  Thus, based upon the principles espoused in 
Lehman
, Skubisz should not be entitled to reap the benefits of his or his workers' wrongdoings and must suffer the penalty of exclusion of these 38 votes from his vote total.  Accordingly, we affirm the trial court's method of deduction.

CONCLUSION

For the reasons stated, we affirm the judgment of the circuit court of Cook County.

Affirmed.

WOLFSON and GARCIA, JJ., concur.

FOOTNOTES
1:
Since Skubisz has not properly captioned the title of this case, we have corrected it.

2:
Only those motions and decisions relevant to the issues on appeal are detailed here.  Additionally, the trial court's rationale is not detailed with respect to these motions since our review is 
de novo
.

3:
During his examination, Skubisz would not answer questions as posed and, at one point, the trial court commented that his answers at trial, and in his deposition, were "pretty elusive."

4:
We note that the trial court referred to both 39 and 38 illegal votes throughout the order.  However, the court ultimately deducted 38 votes from Skubisz's vote total.

5:
The trial court's ruling involved 38 votes, not 34.  

6:
This case involved an equal protection challenge, not a challenge in connection with the Voting Rights Act or ADA and, therefore, will be discussed below in its proper place.